their actions went "beyond all possible bounds of decency" such that they could "be regarded as atrocious, and utterly intolerable in a civilized community." We agree with the district court's conclusion. Most importantly, the defendants did not murder Tammy Sperle. Instead, Herndon, acting on his own, committed the crime. Any criticism of either the HVMF's security measures or the defendants' failure to prevent Herndon and Tammy Sperle from coming into contact with each other relates to errors of judgment that the defendants arguably made. But their purported mistakes are not "atrocious, and utterly intolerable in a civilized community."

For these reasons, we conclude that Allan Sperle has failed to establish a claim of intentional infliction of emotional distress. The district court therefore did not err in granting summary judgment to the defendants with respect to this cause of action.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2002 FED App. 0251P (6th Cir.)
File Name:  02a0251p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――――

ALLAN J. SPERLE, Personal
Representative of the Estate
of Tammy L. Sperle,
        *Plaintiff-Appellant,*                    No. 00-1468

        *v.*

MICHIGAN DEPARTMENT OF
CORRECTIONS, KENNETH L.
MCGINNIS, ANDREW
JACKSON, GERALDINE
WILLIAMS, DONALD PROUGH,
STEPHEN MORTON, PETER
ZISSIMOS, and CLARENCE
HERNDON,
        *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 98-70625—Robert H. Cleland, District Judge.

Argued:  June 19, 2002

Decided and Filed:  July 25, 2002

Before:  COLE and GILMAN, Circuit Judges; MILLS, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Larry W. Mazey, ROTHE, MAZEY & MAZEY, Southfield, Michigan, for Appellant.  Thomas A. Kulick, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONS DIVISION, Lansing, Michigan, for Appellees.  **ON BRIEF:** Larry W. Mazey, Scott L. Mazey, ROTHE, MAZEY & MAZEY, Southfield, Michigan, for Appellant.    Thomas A. Kulick, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONS DIVISION, Lansing, Michigan, for Appellees.

_____

**OPINION**

_____

RONALD LEE GILMAN, Circuit Judge.  Tammy L. Sperle was murdered by an inmate while working as the storekeeper at the Huron Valley Men's Facility (HVMF), a  Michigan state prison.   The decedent's husband, Allan J. Sperle, subsequently brought this lawsuit against the Michigan Department of Corrections (MDOC) and various individuals associated with the MDOC and the HVMF.  Sperle alleges, among other things, that the defendants (1) violated his wife's substantive due process rights by failing to prevent her murder, (2) allowed a sexually hostile work environment to exist at the HVMF, and (3) caused the intentional infliction of emotional distress.  The defendants moved for summary judgment.  After concluding that the defendants were entitled to judgment as a matter of law, the district court granted their motion on all but one of Sperle's claims.  This remaining

_____

[*] The Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

civilized community."  *Id*. at 908-09 (quoting Restatement (Second) of Torts, § 46 cmt. d (1965)).

Moreover, because Tammy Sperle's death occurred during the course of her employment, Michigan's workers' compensation law provides the exclusive remedy unless her employer committed an intentional tort.  Mich. Comp. Laws § 418.131(1) ("The right to the recovery of benefits as provided in this act shall be the employee's exclusive remedy against the employer for a personal injury or occupational disease.  The only exception to this exclusive remedy is an intentional tort.")  Allan Sperle must therefore establish that the defendants' actions meet the statutory definition of an intentional tort—a "deliberate act of the employer" through which "the employer specifically intended an injury."  *Id*.; *Travis v. Dreis & Krump Mfg. Co.*, 551 N.W.2d 132, 142 (Mich. 1996) (explaining that "to state a claim against an employer for an intentional tort, the employer must deliberately act or fail to act with the purpose of inflicting an injury upon the employee").

An employer has a specific intent to injure an employee "if the employer had actual knowledge that an injury was certain to occur and willfully disregarded that knowledge."  Mich. Comp. Laws § 418.131(1); *Travis*, 551 N.W.2d at 143 (clarifying that this definition provides the elements that are necessary to establish an intent to injure an employee—"actual knowledge," "certain to occur," and "willfully disregarded"—where no direct evidence exists and the intent must be proved through circumstantial evidence). In the present case, the record provides no evidence that any of the individual defendants were certain that Tammy Sperle's murder was going to occur, even if we assume that Warden Jackson refused to make himself available to receive a warning concerning a danger to Tammy Sperle's life.

The district court also concluded that the record before it failed to establish that the defendants' conduct was "extreme and outrageous."  It recognized that certain of the defendants might have acted negligently, but determined that none of

fact as to element two" and "as to whether at least some inmate subjected Ms. Sperle to unwanted sexual communication."

But Allan Sperle's affidavit, contrary to the district court's position, is insufficient to create a genuine issue of material fact with respect to these issues. As the defendants emphasize, Allan Sperle's affidavit is not based upon personal knowledge. A party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact. *Weberg v. Franks*, 229 F.3d 514, 526 n.13 (6th Cir. 2000) (disregarding many of the plaintiff's allegations because they were based upon hearsay rather than personal knowledge); Fed. R. Civ. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."). Allan Sperle has therefore failed to present admissible evidence regarding the existence of unwelcome sexual harassment directed towards his wife. We thus conclude that the district court did not err in granting summary judgment to the defendants with respect to this cause of action.

### D.   Intentional infliction of emotional distress

Allan Sperle's final argument is that the defendants' failure to prevent Tammy Sperle's murder renders them liable for the intentional infliction of emotional distress. A claim of intentional infliction of emotional distress under Michigan law requires a plaintiff to establish four elements: "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905, 908 (Mich. 1985) (internal quotation marks omitted). To be considered "extreme and outrageous," the conduct in question must have been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a

claim, brought under state law, was then dismissed without prejudice. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.  Factual background

Tammy Sperle began working as the storekeeper at the HVMF's prisoner store in June of 1994. Prison inmates are able to purchase personal items such as cigarettes, snack food, stationery, and grooming supplies at the store. As the storekeeper, Tammy Sperle was responsible for ordering merchandise from vendors, selling the goods to inmates, keeping track of the monthly inventory, transporting items from the HVMF's warehouse to the store, and supervising three prisoner employees. She also held monthly meetings with two inmates who served on a subcommittee of the Warden's Forum, a group of elected representatives who conveyed the concerns and complaints of inmates to the HVMF staff. During these meetings, she would answer the representatives' questions and elicit their views regarding what products the inmates wanted to have added to the store's inventory. No other HVMF employee worked in the store with Tammy Sperle.

The store, which was located in the HVMF's school building, had two entrances. One was a steel door that led from the exterior prison yard into the store. This door, which had a large window that permitted someone inside the store to see persons standing outside of it in the yard, was always kept locked. It could be opened from the yard by using a key and from inside the store by pushing a bar. Only Tammy Sperle, the HVMF warehouse workers who sometimes substituted for her, and the yard sergeant had keys to this exterior door.

The second entrance was through a door leading from the hallway inside the school building to a section of the store where a laundry was located. This door had a long, narrow window. At some point prior to her murder, Tammy Sperle

covered this window to prevent prisoners who were in the school building for classes from looking in at her as they passed the doorway or from knocking on the door to ask her about merchandise. Several of the defendants were aware that the window was covered prior to Tammy Sperle's murder. They disagree as to whether the inability to look into the store was a security risk.

Defendants Stephen Morton and Peter Zissimos were working as corrections officers at the HVMF in February of 1996. Their duties included maintaining security in the school building. Morton's responsibilities required him to enter each classroom twice an hour to make certain that the rooms were secure. Neither Morton nor Zissimos, however, was instructed to check on Tammy Sperle.

On February 5, 1996, Tammy Sperle was murdered while working in the store. An investigation into her death revealed that HVMF inmate Clarence Herndon strangled Tammy Sperle sometime between 12:35 p.m. and 1:00 p.m. that day. A Michigan state-court jury convicted Herndon of first-degree murder in October of 1998.

Tammy Sperle's first encounter with Herndon occurred when she began working at the HVMF in June of 1994. Herndon was serving as a prisoner store worker at that time. Tammy Sperle terminated his employment the following month, however, because his medical limitations restricted his ability to perform the necessary work. Herndon filed a grievance that sought reassignment within the store, but his request was denied. Tammy Sperle and Herndon continued to see each other at the HVMF after his dismissal. In fact, Corrections Officer Zissimos observed them arguing in January of 1996.

On the morning of her murder, Tammy Sperle met with the two members of the prisoner store committee, a subcommittee of the Warden's Forum. These two members were Herndon and inmate Michael Miller. The meeting, which included, among other things, discussions of a soup sample, lasted for about an hour. Corrections Officer B.

---

### C.   Hostile work environment

Allan Sperle also alleges that his wife told him prior to her death that she frequently experienced a great deal of sexual harassment while working as the HVMF prison storekeeper. He avers that she told him that the inmates who were customers, store employees, and members of the store committee would whistle at her and make sexual comments and obscene sexual gestures to her, all of which were unwelcome. Allan Sperle contends that he observed how this sexual harassment affected his wife, causing her to experience mental and emotional suffering that interfered with her job.

Under Michigan law, a plaintiff must satisfy five elements to establish a hostile work environment claim based upon sex:

> (1) the employee belonged to a protected group; (2) the employee was subjected to communication or conduct on the basis of sex; (3) the employee was subjected to unwelcome sexual conduct or communication; (4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the plaintiff's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior.

*Chambers v. Trettco, Inc.*, 614 N.W.2d 910, 915 (Mich. 2000). The defendants concede that, as a woman, Tammy Sperle was a member of a protected group. But they contend that the remaining elements of a hostile work environment claim have not been established.

The only evidence of unwelcome sexual comments or conduct appears in Allan Sperle's affidavit, in which he recounted what Tammy Sperle told him on an unspecified date before her murder. Although the district court acknowledged that Allan Sperle had no personal knowledge of any harassment that Tammy Sperle experienced, and that his potential testimony might face evidentiary problems if the case were to proceed to trial, it nevertheless concluded that "his affidavit probably establishes a genuine issue of material

work with the plaintiff, despite the fact that she had been told that she would not have to work alone with violent sex offenders. *Id.* at 120. As the court noted, the inmate's files indicated that he "was considered very likely to commit a violent crime if placed alone with a female." *Id.*

The Ninth Circuit held that these facts were sufficient to state a § 1983 claim, because the defendants had created the danger that resulted in the plaintiff's rape by selecting the inmate to work with the plaintiff and because the plaintiff's allegations established that the defendants acted with deliberate indifference to her safety. *Id.* at 121-23. In the present case, however, the record does not support a finding that the defendants allowed Herndon to be alone with Tammy Sperle. His entrance into the prisoner store at the time of Tammy Sperle's murder, rather than being orchestrated by the defendants as in *L.W.*, was unauthorized. In addition, even after having an argument with Herndon about a month before her murder, Tammy Sperle never objected to having periodic contact with him.

Allan Sperle also contends that Herndon was cloaked with the authority of the state, and thus should be considered a state actor. This position, however, contradicts his representations to the district court, where Allan Sperle's counsel informed the court that he was not contending that Herndon was a state actor. As this court has previously explained, "[t]he theory upon which the case was submitted and argued in the district court cannot, when an adverse judgment results, be discarded and a new, contradictory theory be substituted and successfully invoked on appeal." *Corbin v. Baltimore & O. R. Co.*, 234 F.2d 78, 81 (6th Cir. 1956) (per curiam). We therefore decline to consider Allan Sperle's contrary argument on appeal.

For all of these reasons, we conclude that Allan Sperle has failed to establish that the individual defendants violated his wife's right to substantive due process. The district court therefore did not err in granting the defendants summary judgment with respect to the substantive due process claim.

Christian spoke with Tammy Sperle at about 10:30 a.m., after the meeting had ended, and asked her what she had planned for the day. She told him that no inmates would be in the store and that she would be working on the inventory by herself. Christian was then relieved by Tammy Sperle of any store duties and was reassigned by the HVMF administration to assist in providing custody for an inmate who was being taken to the hospital. If the store had been open for inmates to purchase items, one corrections officer would have been assigned to the store and a second officer would have been monitoring the line outside the store.

After the meeting of the prisoner store committee, Herndon left the school building and checked into his housing unit at 10:35 a.m. He left the housing section at 11:55 a.m. when his unit was called for lunch. Herndon was later observed in his housing unit at 1:00 p.m.

Perry Taylor, a HVMF employee who had been working at the prison's Technical Rules Violation Center, found Tammy Sperle lying in a pool of blood on the floor of the prisoner store at 1:40 p.m. Efforts to resuscitate her were unsuccessful. Prior to Taylor's finding Tammy Sperle's body, HVMF officials had telephoned the store at 12:45 p.m. and 1:00 p.m., but those calls went unanswered.

Several details relating to the events surrounding Tammy Sperle's murder are the subject of disagreement between the parties. The first dispute pertains to the yard sergeant's key ring, which included a key to the store's exterior door. Both parties agree that the key ring was reported missing on December 11, 1995. But Allan Sperle contends that its whereabouts was not fully established prior to his wife's murder. Although an e-mail message stated that the key ring was found on the perimeter road outside of the HVMF's fencing on January 30, 1996, Allan Sperle emphasizes that the return of the key ring was never documented in any logbook.

The second subject of disagreement relates to the availability of personal protection devices (PPDs) for HVMF employees working in the school building. A PPD emits an

electronic signal that enables employees to communicate with the HVMF's security guards in the event of an emergency. If the button on a PPD is pressed, an alarm sounds in the prison's control center to indicate that the staff member to whom the transmitting PPD has been assigned is in danger and needs assistance. The defendants acknowledge that Tammy Sperle was not wearing a PPD on the day of her murder and had not previously been issued a PPD. Allan Sperle contends that his wife was unable to obtain a PPD because Corrections Officer Morton had stored the PPDs for the school building in a locked cabinet and had never issued them to the building's employees. Moreover, not all of the PPDs available at the HVMF worked in the school building.

The third disputed subject is the method by which Herndon entered the store before strangling Tammy Sperle. Although the defendants contend that Tammy Sperle must have seen Herndon through the window and voluntarily allowed him to enter the store by opening the prison-yard door for him, Allan Sperle notes that the absence of any eyewitnesses prevents anyone from knowing for sure how Herndon entered. Allan Sperle raises the possibility that Herndon might have opened the door with the key from the yard sergeant's key ring or a copy of that key. But this scenario is inconsistent with Allan Sperle's alternate contention that Herndon came to the prisoner store "cloaked with the authority given to him by Warden Jackson and Deputy Warden Williams as the Chairman of the Warden's Forum and as a Prisoner Store Committee Member (pursuant to MDOC Policy Directives and HVMF Operating Procedures), purportedly to discuss official store business with Tammy Sperle regarding the soup sample that she gave him earlier that day, and he used his authority to get Tammy Sperle to open the yard door to the store and to become his victim."

The fourth matter in contention pertains to whether the HVMF violated any MDOC policy directives by failing to escort the inmates to the prison cafeteria. Herndon was unsupervised for about 55 minutes on the day of Tammy Sperle's murder, including the time when the murder

attempts to secure Nobles's release. *Id*. at 235-36. But this court explained that "[h]owever derelict in their duties the prison officials may have been here, it cannot be said that they *deliberately* decided to have plaintiff Nobles taken captive and raped . . . ." *Id*. at 236 (emphasis in original). This court also rejected Nobles's argument "that the conduct of the defendants . . . amount[ed] to deliberate indifference which shocks the conscience." *Id*. at 237-38 (internal quotation marks omitted).

We find *Nobles*'s conclusions to be equally applicable to the present case. Although Allan Sperle argues that *Nobles* is distinguishable because it involved a prison corrections officer who had been trained in self-defense rather than a civilian employee who was responsible for her own security, we believe that this is a distinction without a legal difference. Both *Nobles* and the present case involve prison inmates inflicting harm upon a prison employee. In *Nobles*, the rapist had engaged in previous actions indicating that he might be dangerous to others, and more effective negotiation techniques might have prevented the plaintiff's rape. Similarly, Warden Jackson was allegedly unresponsive to an inmate's attempt to convey a warning about Tammy Sperle's murder, and the defendants in the present case arguably could have taken more effective steps to enhance Tammy Sperle's security. These deficiencies, however, are insufficient to demonstrate that the defendants were deliberately indifferent to the events preceding Tammy Sperle's murder, just as the errors in *Nobles* did not establish that the prison officials' actions amounted to more than negligence.

Allan Sperle, however, argues that the present case is more closely analogous to *L.W. v. Grubbs*, 974 F.2d 119 (9th Cir. 1992), than to *Nobles*. In *L.W.*, the Ninth Circuit held that the plaintiff, a registered nurse employed by the state of Oregon at a medium-security custodial institution for young male offenders, stated a § 1983 claim based upon violations of her Fourteenth Amendment substantive due process rights. *Id*. at 123. The plaintiff was assaulted and raped by an inmate who was a violent sex offender that the defendants had selected to

Tammy Sperle by providing PPDs to school building employees, adding extra security guards, or insuring greater supervision of Herndon, they did not act in an arbitrary manner that "shocks the conscience" or that indicates any intent to injure her. *Lewellen v. Metro. Govt. of Nashville & Davidson County*, 34 F.3d 345, 351 (6th Cir. 1994) ("What the defendants in this case clearly did *not* do was engage in arbitrary conduct intentionally designed to punish someone—*e.g.*, giving a worker 'a particularly dangerous assignment in retaliation for a political speech . . . or because of his or her gender . . . .'") (quoting *Collins*, 503 U.S. at 119 (internal citations omitted)).

Our conclusion does not change when we apply the deliberate-indifference standard. "Deliberate indifference has been equated with subjective recklessness, and requires the § 1983 plaintiff to show that the state 'official knows of and disregards an excessive risk to [the victim's] health or safety.'" *Ewolski*, 287 F.3d at 513 (footnote omitted) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Pursuant to this definition, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Once the state actor draws the necessary inference, "the official must act or fail to act in a manner demonstrating reckless or callous indifference toward the individual's rights." *Ewolski*, 287 F.3d at 513 (internal quotation marks omitted). The facts before us simply fail to demonstrate this degree of culpability on the part of the defendants.

An instructive case that very much parallels the present situation is *Nobles v. Brown*, 985 F.2d 235 (6th Cir. 1992). In *Nobles*, this court held that a female state corrections officer who was taken captive by an inmate and subsequently raped failed to establish a violation of the Due Process Clause. *Id*. at 238. The inmate who raped Nobles was known to be dangerous, and he had taken a female corrections officer hostage five months before. Moreover, the prison officials had not used appropriate negotiation techniques in their

occurred. According to Allan Sperle, this unsupervised period would not have occurred if the HVMF had adhered to its operating procedure for prisoner movement. The defendants, however, insist that Herndon's unsupervised status did not violate any MDOC policy.

Finally, the parties disagree as to whether defendant Andrew Jackson, the warden at the HMVF, refused to make himself available to Larry Thomas, an inmate who wanted to warn him about impending danger to Tammy Sperle. In a note written on prisoner stationery the day after the murder, Thomas stated that he had attempted to speak with Warden Jackson about a threat on Tammy Sperle's life in January of 1996. But Jackson testified in his deposition that he did not recall any attempt by Thomas to tell him of a plan to murder Tammy Sperle.

## B.   Procedural background

This lawsuit was originally filed in a Michigan state court. The defendants removed the case to the United States District Court for the Eastern District of Michigan in February of 1998. Allan Sperle's complaint, an amended version of which was filed in November of 1998, contains six causes of action. The first two counts assert claims under 42 U.S.C. § 1983 for violations of the Fourteenth Amendment's Equal Protection Clause and of the substantive component of the Due Process Clause, respectively. Count III alleges that the defendants violated Michigan's Elliot-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2103(i), by permitting a sexually hostile work environment to exist. The fourth count asserts a claim for gross negligence. Count V alleges that the defendants are liable for the intentional infliction of emotional distress. Finally, Count VI seeks relief under Michigan's wrongful-death statute, Mich. Comp. Laws § 600.2922.

The defendants filed a motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, in April of 1999. After conducting hearings on two separate occasions and requesting that the parties file additional briefings, the district court granted the defendants' motion for

summary judgment with respect to Allan Sperle's first five causes of action and dismissed the remaining wrongful-death claim without prejudice, all in March of 2000. The court concluded that (1) no evidence of invidious discrimination existed, (2) the substantive due process claim failed because the MDOC and HVMF employees had not intentionally injured Tammy Sperle, been deliberately indifferent to her safety, or created or exposed her to any dangers apart from the ordinary working conditions of a state prison, (3) Allan Sperle did not establish a prima facie case of sexual harassment based upon a hostile work environment, (4) the gross negligence claim was not viable because Michigan's workers' compensation law is the exclusive remedy for work-related injuries in the absence an intentional tort by the employer, which had not occurred, and (5) the record failed to support all of the elements necessary for the intentional infliction of emotional distress.

This timely appeal challenges the district court's grant of summary judgment with respect to the § 1983 claim premised upon a deprivation of Tammy Sperle's substantive due process rights, the sexual harassment cause of action, and the alleged intentional infliction of emotional distress. Allan Sperle has not contested the remaining aspects of the district court's order on appeal.

## II. ANALYSIS

### A. Standard of review

A district court's grant of summary judgment is reviewed de novo. *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering such a motion, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

prison storekeeper without incident for two years prior to her murder. Moreover, although the yard sergeant's key ring was reported missing in December of 1995, it was apparently found the next month, despite the fact that its recovery was not officially logged in prior to Tammy Sperle's murder. We also note that if, as Allan Sperle hypothesizes, Herndon persuaded Tammy Sperle to allow him to enter the prisoner store by claiming that he wanted to discuss the soup sample with her, then the significance of the lost key diminishes. This possible scenario also suggests that Herndon gained access to the store because of Tammy Sperle's decision to open the door for him, despite Herndon's lack of authorization to be at the store during his lunch break. These considerations indicate that Tammy Sperle might have faced nothing more than the ordinary risks of working in a prison, and might even have unwittingly contributed to her own demise.

On the other hand, the record permits the inference that Warden Jackson was unresponsive to inmate Thomas's attempt to warn him of a plan to murder Tammy Sperle, that Corrections Officer Zissimos observed Tammy Sperle and Herndon arguing in January of 1996 but took no subsequent actions, and that the defendants failed to provide the HVMF employees who worked in the school building with PPDs. Moreover, in what Allan Sperle contends was a violation of the HVMF's operating policy, Herndon was not supervised for about 55 minutes on the date of Tammy Sperle's murder, during which time the murder occurred. This evidence suggests that the defendants' actions and inactions resulted in a more dangerous working environment than would otherwise have existed for Tammy Sperle.

We will therefore assume, without deciding, that the defendants's actions and omissions increased the danger of Tammy Sperle being harmed by an inmate at the prison. Nevertheless, we conclude that the defendants did not act with the degree of culpability necessary to hold them liable for a substantive due process violation. Even if the individual defendants could have made the working conditions safer for

process violations is the ability of the officials to consider their actions in an unhurried, deliberative manner. *Lewis*, 523 U.S. at 851 ("As the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical, and in the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare.") (internal citation and footnote omitted); *Ewolski*, 287 F.3d at 511 (concluding that the deliberate-indifference standard applied to the plaintiffs' substantive due process claim because the defendants not only had sufficient time to deliberate about their actions, but also engaged in deliberative actions).

Applying these considerations to Tammy Sperle's murder, we first note that the defendants did not restrain Tammy Sperle's liberty by placing her in the state's custody, because she voluntarily sought her job as the storekeeper at the HVMF. *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992) ("Petitioner cannot maintain, however, that the city deprived Collins of his liberty when it made, and he voluntarily accepted, an offer of employment."). Nevertheless, Tammy Sperle worked in a "custodial setting," an environment where the defendants had the opportunity to design the security precautions at the HVMF and to respond to any general dangers that existed. We therefore conclude that the "deliberate-indifference" standard is an appropriate one for evaluating her § 1983 claim. *Ewolski*, 287 F.3d at 511 (applying the deliberate-indifference standard where the defendants contemplated their strategy for five hours before initiating their first attempt to resolve the hostage situation and waited several more hours prior to deploying an armored vehicle at the site of the standoff).

The first question in our analysis of Tammy Sperle's substantive due process claim is whether the defendants created a risk of harm to Tammy Sperle or rendered her more vulnerable to danger. As both the district court and the defendants have pointed out, Tammy Sperle worked as the

party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## B.   Substantive due process

Allan Sperle's substantive due process cause of action alleges that the individual defendants exhibited deliberate indifference to the life and liberty of his wife. He contends that the defendants created the risk of Herndon murdering Tammy Sperle and rendered her more vulnerable to that danger. In support of his claim, Allan Sperle argues that (1) Herndon's criminal record revealed his violent propensities, (2) Corrections Officer Zissimos had seen Herndon and Tammy Sperle arguing in January of 1996 but never reported the incident, (3) the defendants allowed Herndon to serve on the prisoner store committee, (4) Herndon was not properly supervised on the day that he murdered Tammy Sperle, (5) inmate Thomas reported that Warden Jackson was unresponsive to his attempts to inform him of a threat against Tammy Sperle in January of 1996, (6) employees working in the school building were not able to use PPDs, (7) the recovery of the yard sergeant's key ring was not recorded in the log book before Tammy Sperle's murder, and (8) corrections officers did not regularly check on Tammy Sperle when she was working alone in the store.

To bring a successful claim under 42 U.S.C. § 1983, a plaintiff must establish "that (1) a person, (2) acting under color of state law, (3) deprived the plaintiff of a federal right." *Berger v. City of Mayfield Heights*, 265 F.3d 399, 405 (6th Cir. 2001). The individual defendants concede that they were acting under color of state law at all times relevant to the present lawsuit. As a result, the disagreement centers on whether the defendants deprived Tammy Sperle of her substantive due process right to life and liberty.

The Due Process Clause prohibits any state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. In most circumstances, "a State's failure to protect an individual against private violence simply does not constitute a violation

of the Due Process Clause." *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 196 (1989) ("[O]ur cases have recognized that the Due Process Clauses [of the Fifth and Fourteenth Amendments] generally confer no affirmative right to government aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.").

An exception to this general rule exists where (1) "the plaintiff and the state actors had a sufficiently direct relationship such that the defendants owed her a duty not to subject her to danger," and (2) "the officers were sufficiently culpable to be liable under a substantive due process theory." *Stemler v. City of Florence*, 126 F.3d 856, 867 (6th Cir. 1997) (concluding that the defendant police officers violated the plaintiff's substantive due process rights by forcing her to leave the scene of a police stop in her drunk boyfriend's truck, following which she was killed when the truck hit a highway guardrail, despite the police knowing that the plaintiff was incapacitated and that her boyfriend had assaulted her earlier that evening). With respect to the first element of this exception, the existence of a duty to protect private citizens from harm inflicted by third-parties arises if the state places an individual in a custodial setting, creates a risk of harm to an individual, or renders a person more vulnerable to danger. *Ewolski v. City of Brunswick*, 287 F.3d 492, 509, 513-16 (6th Cir. 2002) (explaining that "state officials may violate the Due Process Clause when their affirmative actions directly increase the vulnerability of citizens to danger or otherwise place citizens in harm's way," but holding that the defendants did not violate the plaintiffs' substantive due process rights when they unsuccessfully attempted to resolve a hostage situation); *Davis v. Brady*, 143 F.3d 1021, 1026 (6th Cir. 1998) ("Because the defendant officers had custody of Davis, they owed him a duty of protection that was violated when they abandoned him . . . in a forlorn place.") (internal quotation marks and citation omitted).

This obligation to protect persons from harm inflicted by third parties, however, does not automatically render state

officials liable for the injuries that an individual suffers due to the actions of these private actors. Instead, where such a duty exists, state actors are liable for breaching their obligation to the plaintiff only if they engaged in conduct that "was so 'egregious' that it can be said to be 'arbitrary in the constitutional sense.'" *Ewolski*, 287 F.3d at 510 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). This standard necessarily lacks precise boundaries, but the Supreme Court "has repeatedly instructed that the Fourteenth Amendment protects only against abuse of executive power which 'shocks the conscience.'" *Id*. (quoting *Lewis*, 523 U.S. at 846).

Consistent with this principle, simple negligence does not rise to the level of a substantive due process violation. *Id*. ("At a minimum, the standard requires a showing beyond mere negligence."). The intentional infliction of injury, on the other hand, generally renders state actors liable for violations of a plaintiff's Fourteenth Amendment right to substantive due process. *Id*. (explaining that "it is generally agreed that Fourteenth Amendment liability will attach to 'conduct *intended* to injure in some way unjustifiable by any governmental interest'") (emphasis in original) (quoting *Lewis*, 523 U.S. at 849).

Whether conduct that lies between simple negligence and intentional harm shocks the conscience of the court "depends upon the facts and circumstances of the individual case." *Ewolski*, 287 F.3d at 510. Custodial settings, for example, present a situation where state actors will be held liable for violating a plaintiff's substantive due process rights if they exhibit deliberate indifference to the risk of injury from a private party. *Stemler*, 126 F.3d at 870 ("[W]here the plaintiff suffered injury as a result of being placed in the state's custody, it has consistently and uncontroversially been the rule that a constitutional claim arises where the injury occurred as a result of the state's deliberate indifference to the risk of such an injury."). The key factor in custodial environments and other situations where deliberate indifference renders state actors liable for substantive due