*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0388p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DENNIS PEET (05-1371); JEEMELL SPENCER (05-1373),

　　　　　　　　　　　　　*Plaintiffs-Appellants,*

　　　　　　*v.*

CITY OF DETROIT; DWIGHT PEARSON; LOVIER, Sergeant; SULLIVAN, Sergeant; HOWARD PHILLIPS; PETERSEN, Sergeant; DEBORAH NIX; JACKSON, Lieutenant; J. FISHER; BARBARA SIMON; WILLIAM RICE; CHARLES HOWARD; MARK AMOS; ED RUDONI; VISBARA, Sergeant; CATHERINE ADAMS, Jointly and Severally,

　　　　　　　　　　　　　*Defendants-Appellees.*

Nos. 05-1371/1373

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
Nos. 03-72480; 03-71470—John Corbett O'Meara, District Judge.

Argued: August 1, 2006

Decided and Filed: September 25, 2007

Before: GIBBONS and ROGERS, Circuit Judges; HOLSCHUH, District Judge.[*]

---

## COUNSEL

**ARGUED:** Christopher J. Trainor, LAW OFFICES OF CHRISTOPHER TRAINOR & ASSOCIATES, White Lake, Michigan, for Appellants. Linda D. Fegins, CITY OF DETROIT LAW DEPARTMENT, Detroit, Michigan, for Appellees. **ON BRIEF:** Christopher J. Trainor, LAW OFFICES OF CHRISTOPHER TRAINOR & ASSOCIATES, White Lake, Michigan, Kevin L. Laidler, LAW OFFICES OF KEVIN LAIDLER, Pontiac, Michigan, for Appellants. Linda D. Fegins, CITY OF DETROIT LAW DEPARTMENT, Detroit, Michigan, for Appellees.

---

[*] The Honorable John D. Holschuh, United States District Judge for the Southern District of Ohio, sitting by designation.

ROGERS, J., delivered the opinion of the court, in which GIBBONS, J., joined. HOLSCHUH, D. J. (pp. 12-27), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

ROGERS, Circuit Judge. This appeal is composed of two related cases. Both cases are actions under 42 U.S.C. § 1983 seeking damages from individual Detroit police officers for their alleged unconstitutional seizure and malicious prosecution of the plaintiffs. The plaintiffs, Dennis Peet and Jeemell Spencer, further seek to hold the City of Detroit liable for the officers' alleged constitutional violations. On appeal, the plaintiffs seek to overturn the district court's grant of summary judgment in favor of Dwight Pearson and the City of Detroit. For the reasons given below, we affirm.

**I.**

On the night of April 27, 2000, Detroit police officers Robert Petersen and Charles Howard responded to a call reporting shots fired in progress at the Coney Island restaurant located at 12521 Mack Avenue in Detroit. When they arrived, the officers discovered Reed Byrd suffering from a gunshot wound to the abdomen. Paramedics arrived and transported Byrd to the hospital, where he died at 11:31 p.m. The Wayne County Medical Examiner's Office ruled Byrd's death a homicide. When the officers arrived at the scene of the shooting, they also discovered Leonard McGlory, who had suffered multiple gunshot wounds to his legs. McGlory was transported to the hospital for treatment.

Investigator Pearson of the Detroit police conducted an investigation to determine the identity of the shooter and any accomplices. Investigator Pearson identified the plaintiffs, Dennis Peet and Jeemell Spencer, as suspected accomplices by relying, primarily, on Spencer's pager number, which an eyewitness, Feanda Wilson, provided. The day after the shooting, on April 28, 2000, the police took Peet and Spencer into custody for questioning and put them in a live line-up to see whether witnesses could identify Peet and Spencer. Wilson identified them as accomplices of the murderer. Peet and Spencer remained in jail from April 28, 2000, until their acquittal of all charges on March 28, 2001.

**A. Information That Police Had Prior To Taking Peet and Spencer Into Custody**

The record contains the following evidence as to what the police knew prior to taking Peet and Spencer into custody. John Anderson, who was robbed by the gunman and his accomplices on the night of the shooting, gave a statement to the Detroit police early the next morning at 12:55 a.m. Anderson was "at the gas station" near the Coney Island restaurant "waiting [in line] to pay for my gas" when three men walked in and acted like "they going to buy something." Two of the men stood near Anderson. One of the men yelled at Anderson, "Get that thing." Then, "the other guy that was standing next to me pulled out a gun. I looked at the other guy then the guy said, 'B[***] you know what I mean.'" Anderson then gave the man his money, a total of $125. Anderson subsequently opened the gas station door and ran to his car. As he pulled away in his car, he "heard a gunshot." In total, Anderson heard two gunshots between 10:15 p.m. to 10:30 p.m. on April 27, 2000.

When asked for a description of the men in the gas station who stood near him, Anderson described the first as a black male aged 20 to 25, who was 5'9" tall and weighed 165 to 170 pounds. The man wore a gray pullover jacket with a hood and gray jogging pants. Anderson described the second man as a black male, aged 18 to 25, who was 5'7" to 5'8" tall and weighed 160 pounds. He

wore a red pullover jacket. Anderson did not provide a description of the third person allegedly involved.

Jmo Bracey, who was robbed by the same three men that victimized Anderson on the night of the shooting, gave a statement to the Detroit police early the next morning at 3:05 a.m. Bracey recounted what he saw and heard the previous night. Bracey and his friend Leonard McGlory drove to the Coney Island restaurant and ordered food. Bracey walked to the nearby gas station to buy a cigar. McGlory waited for the food at the restaurant. "When I walked out of the Coney Island," Bracey told the police, "3 guys walked up behind me, like from around the corner of the building." Bracey "saw one guy reach up inside his coat like he was getting a gun out, and I figured I was about to get robbed." Bracey told the police:

> Just then a crackhead called out to the guy and got his attention, and I got inside the gas station before he got his gun out. I told the guy behind the counter that I was about to get robbed, and I took my gold chain off and put it in my sock. Then the 3 guys came in and the one guy took his gun out and put it up to my neck. He says, "Give me your chain and your jacket." I told him that I gave my chain to the guy behind the counter, so the guy with the gun just took my coat . . . . One of the other guys took my money $100 (5-$20's) out of my pocket. The third guy was waiting by the door, like watching out. The guy behind the counter locked the door where they was inside, but after they robbed me, they snatched the door loose and got out. . . .

> I saw 2 of them, I think, run up into the Coney Island, and I heard some shots while they were inside, that had to be when they shot Leonard [McGlory]. Then they ran out and the one with the gun shot 3 times into the front windshield of the red car [in front of the Coney Island], and shot the guy inside the car. Then they took off and ran around the corner of the Coney Island back toward the car wash and Anderson Street. I didn't see them any more after that. I checked on Leonard [McGlory], and he was laying on the floor under the chair back of the video game in the Coney Island, and he was shot in the legs.

Bracey transported McGlory to Riverview Hospital for treatment. McGlory told Bracey that the men had robbed him.

Bracey told the police that he had never seen the men before. Bracey described the gunman as a black male aged 22, who was 5'6" to 5'7" tall, weighed 160 pounds, and had light brown skin and a short-trimmed beard. The gunman wore his hair in braids and was wearing a gray "sweater-jacket, like a spring jacket, and black pants."

Bracey described the man who took his $100 as a black male aged 20 to 25, who was 5'6" tall, weighed 150 pounds, and had "dark skin." Bracey described the third man, the one who stood watch, as a black male of the same age as the man who took his money. The third man stood six feet tall, was thin, and had "brown skin." Bracey said that only the first man had a gun.

Bracey also said that the "girl who worked in the Coney Island," presumably Feanda Wilson, told him that the men had been in the restaurant prior to the shooting and that a friend of the shooter's had given her his number.

Feanda Wilson gave a statement to Detroit police in the early morning after the shooting. Wilson described the events that led up to the shooting. A little before 10:00 p.m., Wilson was at the Coney Island restaurant sitting in her friend Reed Byrd's car, a red Ford Escort parked just outside the restaurant's door. While conversing with Byrd in his car, Wilson saw "a black guy wearing a light gray jogging suit" walk past and head toward the nearby gas station. Wilson then

went to work behind the counter at the restaurant. Moments later, the man in the gray jogging suit entered the restaurant. The man in the jogging suit looked out the window. Wilson then saw two men outside "next to [Byrd's] car, one on each side of it." Wilson

> saw one of the guys open the driver's door and grab my friend and grabbed his black jacket and his red/white/blue shirt off [of] him. My friend was trying to back up and while this was taking place, this guy inside the restaurant with the gray jogging suit went over to a customer who was sitting next to the video game. He told the customer, "What the f[***] are you looking at"? The customer said, "I ain't seen nothing". The guy said, "Naw n[***]a, you saw something," then he just started shooting. Then the guy with the jogging suit [went] outside and over to my friend's car where the other guys are trying to grab my friend out of his car. The guy at the driver's door said, "Get this mother f[***]r too." Then, the guy with the jogging suit just starts shooting at my friend. Then he runs around by the garbage cans. The two other guys who were at the car got into a dark blue Ford F150 pickup, late 80's, early 90's, and backed up, then took off.

Wilson described the man in the jogging suit as a black male, aged 20 to 23, who was 5'7" tall and weighed 165 to 170 pounds with a light complexion. The man wore his hair in braids and also wore a white shirt. Wilson said that the man shot the patron in the restaurant and her friend in the car about three times each.

Wilson described the man who was at the driver's side door of her friend's car as a black male, aged 20 to 25, who was 5'4" to 5'5" tall and weighed 170 pounds with a dark complexion. The driver's side man wore his hair in braids and also had a mustache. Wilson reported that the man wore a leather jacket and dark pants. Earlier, the driver's side man had "been in the restaurant and gave me his phone number, it was 232-0235 or 6235."

Wilson described the man who approached the car from the passenger's side as a black male, aged 20 to 25, who was 5'8" tall, weighed 180 pounds, and had a light complexion. The passenger's side man wore his hair "low cut," and that night had worn a gray, hooded sweatshirt and light-colored pants. When asked if she had seen any of these people before, Wilson replied "Yes." The two had ordered food earlier that night and had eaten their food in the getaway truck while talking.

In addition to this statement given the morning after the shooting, Wilson also spoke with Officer Petersen at the scene of the crime right after the shooting occurred. A police report taken at 9:50 p.m. on April 27 listed Feanda Wilson as the person reporting the offense. The report is not consistent with certain portions of Wilson's account given early the next morning. For instance, the police report identified only two perpetrators, whereas Wilson identified three in her later statement. The police report also confused Reed Byrd with Leonard McGlory, stating that complainant #1 (identified as Reed Byrd in the report's opening) was shot inside the restaurant, while complainant #2 (identified as McGlory) was reported as having been shot in the red car outside the restaurant. Wilson's statement the following morning did not confuse Byrd and McGlory. The police report did not attribute any of its contents to Wilson specifically, and the report identified four other witnesses who might have been sources for the report. It also contained information that Wilson almost certainly did not provide, such as the vehicle identification number of Byrd's car. Petersen signed the report, and it does not contain Wilson's signature or any other indicator of its adoption by Wilson.

The police located and identified Spencer on April 28 by using Spencer's pager number, which they obtained from Wilson, and took him into custody. The record, however, gives no indication how the police initially came to know of Peet's relevance to the shooting. Apparently, the police also learned of Peet in the course of tracking down Spencer using the pager number.

When they approached Peet, he identified himself to Officer Mark Amos as Dennis Peet, showed the officer identification, and admitted to having witnessed a crime that had been committed at the Coney Island restaurant. The police then told Peet that he "was a witness to the murder of Reed Byrd," and demanded that he participate in the police investigation of the crime. Officer Amos told Peet that he was not under arrest but nevertheless handcuffed him and drove him downtown in a police car, despite his protestations and his preference to be driven by family members.

### B. Events After Police Took Peet and Spencer Into Custody

That evening, Peet and Spencer were put into separate line-ups to see whether Wilson could identify them as the murderer's accomplices. At the line-up, Wilson identified both Peet and Spencer as the shooter's accomplices. Spencer's line-up occurred at 5:00 p.m., while Peet's line-up occurred at 7:00 p.m. According to the deposition of Officer J. Fisher, who commented on a photograph of Peet's line-up at Fisher's deposition, Peet was the second shortest of six participants in Peet's line-up. Officer Fisher further testified, based on a photograph of Spencer's line-up, that it looked like Spencer wore his hair in braids, but added, "It's hard to see." Officer Fisher did not say in his deposition that others in the line-up wore their hair differently than Spencer.

Following Wilson's identification of Peet and Spencer on April 28, 2000, Investigator Pearson prepared an Investigator's Report for both Spencer and Peet, which Investigator Pearson completed at around 8:00 p.m. A judge subsequently signed an arrest warrant for Peet and Spencer, whom prosecutors later charged. On May 24, 2000, Peet and Spencer appeared at a preliminary hearing where a state judge determined that probable cause existed to hold them until trial on charges of first degree murder.

Meanwhile, evidence in the case continued to develop in a manner that, on balance, tended to exculpate Peet and Spencer. The police took a statement from McGlory at the hospital on May 2, 2000, recounting what he saw and heard the evening of April 27. Two days later, on May 4, 2000, the police took a second statement from Jmo Bracey. Neither of these witnesses provided information linking Peet or Spencer to the crime. Following the April 28 arrest of Peet and Spencer, Investigator Pearson conducted additional line-ups involving the plaintiffs, none of which produced positive identifications of Peet or Spencer as suspects.

Investigator Pearson wrote in his notes on May 2 at 8:00 p.m., "Feanda Wilson is the only statement out of place. Setting up polygraph for her for 5-3-00 to see if she is lying about the two suspect[s]. . . . Feanda no longer works at Super Coney Island. Fired for stolen money from business." On June 9, 2000, the Detroit police completed a test for fingerprints on Byrd's red Escort. No print impressions matched the prints of Byrd, Peet, or Spencer.[1]

---

[1] Jmo Bracey was deposed on September 1, 2004, in connection with this civil suit. Bracey said that after he gave his first statement to the police, they locked him up and told him that if he did not give them information they would hold him. Bracey asserted in his deposition that after he told the police that Peet and Spencer were innocent, Investigator Pearson locked him up "because they told me I was lying. They thought I was holding evidence, lying to them." This line of questioning in Bracey's deposition regarding the police's alleged threats against him was composed almost entirely of leading questions by counsel for the plaintiffs. Opposing counsel objected repeatedly, but counsel for the plaintiffs retorted, "I can lead any way I want," and, "Go ahead," get a protective order. Counsel for the plaintiffs said to opposing counsel, "You can have a continuing objection on leading, how is that?"

In a deposition taken for this civil suit, Darryl Williams, a witness to the incident at the Coney Island restaurant, testified that the police arrested and locked him up without charges so that they could question him about the incident at Coney Island. Williams also stated that the police directed him to provide the testimony they "wanted to hear" or he would be held longer. Julian Latham, another witness, similarly testified in his deposition that he was arrested as a witness and that the police "coerce[d] me to say that" Peet and Spencer committed the crimes at the Coney Island. Latham said that because the police disliked his testimony exonerating the plaintiffs, the police locked him up and held him for three days, threatening to confine him until he told the "truth" that Peet and Spencer were guilty. Latham said that Investigator Pearson threatened to charge him with murder after he refused to change his story.

Peet and Spencer remained in jail from April 28, 2000, until their acquittal of all charges on March 28, 2001.

### C.  Procedural History

In April 2002, Peet brought his suit in Michigan state court, but defendants removed the case to the United States District Court for the Eastern District of Michigan.  Peet asserted § 1983 claims based on constitutional violations, including arrest without probable cause and malicious prosecution, as well as state-law claims.  (The district court later remanded the state law claims.)  Shortly after the filing of Peet's lawsuit, Spencer brought his own identical lawsuit in the Eastern District of Michigan.

Following discovery, all parties moved for summary judgment.  The district court denied the plaintiffs' summary judgment motion but granted summary judgment in favor of the defendants in two steps.  First, on January 19, 2005, the district court granted the defendants' motions for summary judgment as to the individual officers except Investigator Pearson, and granted summary judgment in favor of Detroit on the municipal liability claims.  The district court took the defense motions for summary judgment under advisement as to Investigator Pearson.  Second, on January 31, 2005, the district court issued opinions and orders in both the cases of Peet and Spencer granting the defendants' motions for summary judgment as to Investigator Pearson.  This appeal followed.

### II.

Reviewing de novo, we affirm the district court's grant of summary judgment to all defendants as to Spencer's suit, because no reasonable juror could find that probable cause did not support Spencer's arrest.  In his brief, Spencer alleges one constitutional violation with respect to his arrest: he claims that it was unsupported by probable cause.  Confining our review to the central issue raised by Spencer, we affirm because probable cause existed to arrest him for the robbery of Reed Byrd.

### A.

The police had probable cause to believe that Spencer had robbed Reed Byrd at Coney Island on April 27.  Officer Amos consequently had probable cause to effect Spencer's arrest when the police took Spencer into custody prior to the police line-up.  In particular, no reasonable juror could disagree that the police could have reasonably believed that Spencer had robbed Reed Byrd, based on Feanda Wilson's knowledge of Spencer's pager number, combined with her statement that the owner of the pager participated in taking Byrd's coat by force.

In *Beck v. Ohio*, the Supreme Court held that probable cause exists when the police have "reasonably trustworthy information [that is] sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense" based on "the facts and circumstances within [the police's] knowledge" at the moment in question. 379 U.S. 89, 91 (1964).  No reasonable juror could disagree that the evidence supplied by Wilson made it reasonable to believe that Spencer had committed robbery in connection with the forceful theft of Byrd's coat, thus supplying probable cause to arrest Spencer on felony charges on April 28 before the line-up.  Wilson told the police in her early-morning April 28 statement that the night before she saw two men approach Byrd's car on either side and take his coat by force.  Wilson saw the man on the driver's side of Byrd's car "open the driver's door and grab [Byrd] and grabbed his black jacket and his red/white/blue shirt off [of] him."  Wilson said that both men then tried to "grab" Byrd "out of his car."

Wilson's eye witness statement is trustworthy information justifying a reasonable belief that these two men robbed Byrd.  *See Beck*, 379 U.S. at 91 (trustworthy information creates probable cause); *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) (holding that firsthand observations are

entitled to a presumption of reliability and veracity). One of the men grabbed Byrd's jacket, thereby depriving Byrd of his property by force. Both men laid their hands on Byrd to remove him from the car, thereby committing robbery.

In addition, the police also had probable cause to believe that Spencer was one of these two robbers, based on Wilson's knowledge of Spencer's pager number. Wilson told police that the robber who approached the driver's side of Byrd's car had "been in the restaurant and gave me his phone number, it was 232-0235 or 6235." It is uncontested that the pager number belonged to Spencer and that the number led the police directly to Spencer. Based on these facts, the police had probable cause to arrest Spencer for robbing Reed Byrd of his coat.

Moreover, other signed witness statements in the record available to Investigator Pearson around the time of the arrest—for example, Jmo Bracey's and John Anderson's statements on April 28—do not materially disagree with Wilson's April 28 witness statement and thus did not undermine the probable cause to arrest Spencer. To the contrary, Bracey's and Anderson's accounts of the robbery and shooting agree with Wilson's account in some important respects; for instance, both Bracey and Wilson said that one of the gunman's accomplices had a dark complexion. Wilson said the first accomplice looked 20 to 25 years old; Bracey's estimate was exactly the same. Wilson said the first accomplice was 5'4" to 5'5" and weighed 170 pounds; Bracey's similar (but slightly different) recollection was 5'6" and 150 pounds. Anderson, also, similarly remembered one of the accomplices as being 5'7" tall and weighing 160 pounds. A line-by-line comparison of the three accounts is not necessary. The three accounts are not identical, but their differences are minor and are of the sort to be expected when different eye witnesses recollect the same event. Overall, the accounts resemble each other adequately to justify a reasonable officer's belief in Wilson's account in light of Anderson's and Bracey's accounts, and Spencer does not argue that inconsistencies within Wilson's statement undercut her credibility such that a reasonable juror could find that there was no probable cause to justify Spencer's arrest.

## B.

Moreover, the evidence that emerged after the arrest, such as statements by witnesses Bracey and McGlory, Investigator Pearson's doubts about Wilson's credibility, and the alleged suggestiveness of the police line-up, do not aid Spencer's argument that probable cause did not support his arrest. This post-arrest evidence does not show that probable cause was lacking on April 28, when the police arrested Spencer. The Supreme Court has held that probable cause determinations must be evaluated according to the information the police knew at the moment of the challenged conduct, not information learned for the first time afterwards. *See Beck*, 379 U.S. at 91. The statements that Bracey and McGlory made to the police after April 28, Investigator Pearson's post-arrest doubts about Wilson's credibility, and the line-up are therefore irrelevant to the probable cause issue here, because they occurred after Spencer had already been arrested.

Also regarding post-arrest evidence, Spencer further argues that the police had a duty to release him from jail the moment that new, exculpatory evidence came to light. When subsequent developments disprove the correctness of a previous police determination that probable cause exists, the argument goes, the police no longer have justification under the Fourth Amendment to continue the incarceration, and must release the suspect. Spencer cites no authority articulating this principle as a Fourth Amendment obligation. It lacks support in this circuit's case law. Nor does Spencer offer any rationale from cases or other authority that would warrant a court-imposed requirement on police to release suspects the moment sufficiently exculpatory evidence emerges.

We note that policy does not support such a new development in the law. Such a rule would give investigators the responsibility to reevaluate probable cause constantly with every additional witness interview and scrap of evidence collected. Moreover, as investigations progress, the

strength of evidence against a suspect may frequently change. Some released suspects would be rearrested when further inculpatory evidence emerged and showed that probable cause existed after all. And in lengthy, close cases these suspects might be re-released, and then re-rearrested, and so on.[2]

## C.

The district court also properly granted summary judgment to the officers as to Spencer's claim for malicious prosecution. With regard to that claim, Spencer has the problem of the judicial determination of probable cause following the evidentiary preliminary hearing. While that determination has no preclusive effect *if* there is evidence that the claim of malicious prosecution is based on a police officer's supplying false information to establish probable cause, *Hinchman v. Moore*, 312 F.3d 198, 202–03 (6th Cir. 2002), there is no evidence in this record that Investigator Pearson or the county prosecutor or anyone else supplied the magistrate judge at that hearing with false information to establish probable cause. To the contrary, the transcript of the preliminary examination in the record shows that the only defense argument made was the alleged insufficiency of the evidence to support the charges, and that argument did not rely on any allegation that false information had been supplied.

Because Spencer has not shown that the state judge relied on false information to determine that probable cause existed to bind Spencer over for trial, Spencer is precluded from relitigating the matter on a theory of malicious prosecution in this § 1983 suit. *See, e.g.*, *Buttino v. City of Hamtramck*, 87 F. App'x 499, 502–05 (6th Cir. 2004).

## D.

The conclusion that Spencer's arrest was supported by probable cause also requires affirmance of the district court's grant of summary judgment in favor of the City as to Spencer's suit. Since the police had probable cause to arrest Spencer, the officers did not commit the constitutional wrong that Spencer's suit alleges. Consequently, the City of Detroit cannot be held liable under

---

[2] The dissent argues that authorities violated Spencer's and Peet's constitutional rights by filing a misleading request for a warrant. In their complaints, however, Spencer and Peet do not raise the dissent's theory that deficiencies in the warrant request amounted to an unconstitutional arrest. Moreover, the district court certainly did not think that Spencer and Peet were raising the dissent's theory, presumably because (to the extent that Spencer and Peet raised the theory at all below) they mentioned the discrepancies in the warrant request to prove that officers lacked probable cause for the initial arrest.

Assuming that the argument is properly before us, the dissent's theory has significant problems. The first two problems are temporal. First, the dissent relies on information that Pearson obtained after he submitted the warrant request to suggest that Pearson always doubted whether probable cause existed. The evidence, however, shows that Pearson submitted the warrant request on the day after the murder, when signs suggested Spencer and Peet's culpability, and the record does not show that authorities questioned their case after the initial arrest but before authorities submitted the warrant request. The dissent points to Pearson's deposition statement that he "might have had doubts" about Wilson's truthfulness before the warrant was signed, but even if Pearson had doubts before the warrant was signed, Pearson's statement does not indicate that those doubts existed before the warrant request was submitted. Second, the dissent faults the investigators for mentioning Wilson's eyewitness identification in their warrant request. While it is true that Wilson identified Spencer and Peet after the initial arrests, her eye-witness identification undermines Spencer's and Peet's claim that there was no probable cause at the time that Pearson submitted the warrant request. In essence, the dissent faults authorities for failing to include post-*warrant* exculpatory evidence but then faults authorities for including post-*arrest* incriminating evidence. In this case, there was probable cause at the time of the initial arrest, and the evidence after the arrest but before authorities submitted the warrant request did not clearly exonerate Spencer and Peet. Third, the dissent demands a level of perfection that would be difficult for most police departments to meet. Undoubtably, the magistrate judge would have benefitted from a more precise warrant request that clearly delineated what each witness would say and differences between similarly looking cars (assuming that the witnesses could provide consistent and clear descriptions in a situation like this one). Such precision, where there is probable cause to justify an arrest, is not a constitutional requirement.

§ 1983 for police conduct that inflicts no constitutional injury. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.").

The grant of summary judgment to the City as to Spencer's suit was proper.

## III.

The district court also properly granted summary judgment as to Peet's suit against the officers. First, Peet only appeals the district court order dismissing the complaint against Pearson. Peet does not challenge the district court order dismissing the complaint against Officer Amos, and we do not address whether a reasonable juror could find that Officer Amos arrested Peet without probable cause. Second, the record does not reflect that Pearson participated in the arrest of Peet. His deposition says that he did not, his progress notes do not mention it, and we are directed to no contrary testimony. As a result, we do not need to engage in speculation as to why Officer Amos arrested Peet or what role Pearson might have played. Finally, for the reasons above regarding Spencer's claim for malicious prosecution, it was proper for the district court to grant summary judgment with respect to Peet's malicious prosecution claim.

The district court also properly granted summary judgment to the City as to Peet's claim for municipal liability, because Peet has not produced sufficient evidence tending to prove that Detroit tolerated a custom of federal rights violations that could have caused Peet to be arrested without probable cause. "To prevail in a § 1983 suit against a municipality, a plaintiff must show that the alleged federal right violation occurred because of a municipal policy or custom." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).

Peet argues in his brief that the evidence creates a genuine issue of material fact about whether Detroit has a "custom" of "intimidating witnesses, falsely accusing/arresting witnesses during police investigations, and retaliating against citizens who do not support the department in its coercive activities." Peet also argues in his brief that "the evidence presented in this case shows a failure to train and supervise" Detroit police officers. Thus, in this court Peet relies on two municipal-liability theories: first, custom; and second, failure to train. Ultimately, Peet has supplied too little Rule 56 evidence to create a genuine issue of material fact regarding the custom theory, and he raises the failure-to-train theory for the first time on appeal.

## A.

Peet has presented insufficient Rule 56 evidence to create a trial-worthy dispute over whether Detroit has a custom of tolerating federal rights violations. At most, Peet has presented admissible record testimony that he, Darryl Williams, and Julian Latham were incarcerated and coerced in violation of their constitutional rights. But no reasonable juror could find on the basis of three discrete incidents that a city-wide policy or custom of unconstitutional treatment of witnesses was in place.

Peet cites the following evidence to establish a policy or custom of arresting witnesses without probable cause. Darryl Williams testified that the police arrested and locked him up without charges so that they could question him about the shooting at Coney Island. Williams also stated that the police directed him to provide the testimony they "wanted to hear" or he would be held longer.

Julian Latham similarly testified that he was arrested for questioning and that the police "coerce[d] me to say that" Peet and Spencer committed the crimes at the restaurant. Latham said that because the police disliked his testimony exonerating the plaintiffs the police locked him up and

held him for three days, threatening to confine him until he told the "truth" that Peet and Spencer were guilty. Latham said that Investigator Pearson threatened to charge him with murder after he refused to change his story.

Bracey testified similarly, but solely as the result of admittedly leading questions by counsel for the plaintiffs to which opposing counsel objected repeatedly. Consequently, Bracey's testimony to this effect is inadmissible and will not be considered.[3]

All told, the plaintiffs have produced only the arrests of Peet, Williams, and Latham as admissible evidence of a city-wide custom of arresting witnesses without probable cause. But that is not enough to create a genuine issue of material fact. A custom or policy must be shown by "a clear and persistent pattern," and three discrete instances in one investigation is simply not enough to reasonably draw such a conclusion. *See Thomas*, 398 F.3d at 432. Just as this court held in *Thomas* that no reasonable juror could "infer a municipal-wide policy based solely on one instance of potential misconduct," *id.*, no reasonable juror could infer such a custom or policy based on a mere three instances that are limited to one police investigation.

## B.

In his brief, Peet argues that the City is liable for officers' constitutional violations against him because the City failed to train its officers adequately. Peet, however, neglected to raise this argument in the district court. We decline to consider Peet's failure-to-train argument for the first time on appeal. *See Saylor v. United States*, 315 F.3d 664, 669 (6th Cir. 2003).

The grant of summary judgment to the City as to Peet's claim for municipal liability was proper.

## IV.

Finally, Peet and Spencer argue that the City is liable for subornation of perjury under the Due Process Clause, based on the rule of *Sperle v. Michigan Department of Corrections*, 297 F.3d 483, 491 (6th Cir. 2002). But *Sperle* does not permit a claim for subornation of perjury on this record. *Sperle* permitted recovery for government actions that increase the risk of injury to the plaintiffs from private parties. *See id. Sperle* has no application to this case. There is no risk of injury from private parties to speak of here that could have resulted from the defendants' alleged subornation of perjury—at least none pointed out by Peet and Spencer in their briefs. Consequently, the plaintiffs' argument based on *Sperle* has no merit.

No supportable basis has been presented for reversing the grant of summary judgment to the City with respect to Peet's and Spencer's subornation of perjury claim.

---

[3] Peet also points to other evidence that we may not consider. For instance, he alleges that in proceedings in a different case in federal district court in Michigan, a Detroit police sergeant admitted that a custom, policy, and practice of detaining all witnesses exists in Detroit. In particular, Peet cites *Taylor v. City of Detroit*, 368 F. Supp. 2d 676, 692 (E.D. Mich. 2005), to establish this fact. The district court opinion in *Taylor* does not demonstrate a policy. First, *Taylor* itself held only that a genuine issue of material fact exists regarding Detroit's alleged custom of arresting witnesses without probable cause. *See id. Taylor* did not hold that such a custom actually exists; that issue remains to be decided at a later trial. Second, the *Taylor* court's holding that a genuine issue of material fact existed in that case was record-specific and may not be automatically imposed on other district courts or this court. Since the evidence on which *Taylor*'s denial of summary judgment in favor of the defense is premised is not before this court, *Taylor* has no relevance to the "custom" issue in this appeal. Third, while Peet had the district court opinion admitted into evidence, he did not obtain admission of the evidence upon which the district court relied. Finally, the plaintiffs point to a consent judgment entered into by the City and the U.S. Department of Justice. The consent judgment is not part of the record in this case.

**V.**

For the foregoing reasons, the judgment of the district court is affirmed.

---

### CONCURRING IN PART, DISSENTING IN PART

---

HOLSCHUH, District Judge, concurring in part and dissenting in part. I concur in the majority opinion concerning plaintiffs' claims of subornation of perjury (Section IV).

With great respect for my colleagues, I must dissent from the remainder of the majority opinion which holds that: (1) there was probable cause for Spencer's arrest, and that any deficiencies in the request for an arrest warrant, submitted after Spencer was taken into custody, are irrelevant to that probable cause determination; (2) even if Peet had been arrested without probable cause, Dwight Pearson cannot be held liable because he did not participate in Peet's arrest; (3) Peet submitted insufficient evidence that his illegal arrest was caused by a custom or policy of the City of Detroit; and (4) plaintiffs are estopped from asserting their claims of malicious prosecution.

## I.     Claims of Arrest Without Probable Cause

### A.     The Effect of Deficiencies in the Request for an Arrest Warrant After a Warrantless Arrest

On appeal, Jeemell Spencer and Dennis Peet argue that the district court erred in granting summary judgment in favor of Dwight Pearson on their § 1983 claims for arrest without probable cause. As the district court noted, Pearson was "the homicide officer in charge of the investigation." J.A. at 42.[1] After Spencer and Peet were arrested, Pearson prepared an investigative report, which he submitted to the Wayne County Prosecutor's Office along with all then-existing witness statements, and a request for an arrest warrant. The Prosecutor's Office, in turn, submitted that information to a local state court judge who determined that probable cause existed and issued an arrest warrant for Spencer and Peet.

The arrest warrant was issued even though Spencer and Peet were already in custody. This is because, under Michigan law, if an accused is in custody as a result of a warrantless arrest, a magistrate, upon a finding of "reasonable cause," *i.e.* probable cause, shall either issue an arrest warrant or make an endorsement upon the complaint of a finding of reasonable cause. M.C.L.A. 764.1c. Michigan's statute codifies the Supreme Court's holding in *Gerstein v. Pugh,* 420 U.S. 103, 124-125 (1975), that whenever a person is arrested without a warrant, an impartial judge must make a "fair and reliable determination of probable cause." This requirement implements the "Fourth Amendment's protection against unfounded invasions of liberty and privacy." *Id.* at 112. The probable cause determination must generally be made within 48 hours after the arrest. *See County of Riverside v. McLaughlin,* 500 U.S. 44, 56 (1991). Unless the judge finds that probable cause existed for the arrest, the suspect must be released. The relevant question is whether, at the moment of the arrest, probable cause existed to believe that the arrestee had committed a crime. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964).

Pearson's investigative report was presented to a judge in support of the request for the arrest warrant and, unquestionably, was relied upon by the judge in making the probable cause determination. One of the key issues in this case is whether it matters that Pearson's report contained false and misleading statements and omitted material exculpatory information.

---

[1] All citations to the Joint Appendix refer to the Joint Appendix submitted in connection with *Peet v. City of Detroit*, Case No. 05-1371.

Citing *Beck*, the majority finds that any events occurring after the arrests of Spencer and Peet are irrelevant. Maj. Op. Section II(B). I certainly agree that, pursuant to the holding in *Beck*, only the evidence known to the officer at the moment of the arrest is relevant to a determination of whether probable cause exists to believe that the arrestee has committed a crime. The majority, however, overlooks the important constitutional issue presented by the facts of this case. It is not a simple question of whether probable cause did, in fact, exist for the arrests of Spencer and Peet, as the majority believes. At issue in this case is whether a person acting under color of state law -- in this case, Detective Pearson -- can be held liable for a Fourth Amendment violation under 42 U.S.C. § 1983 for submitting false and misleading statements and making material omissions in his request for an arrest warrant. In this case, the plaintiffs already being in custody, the purpose was to obtain a finding that probable cause existed for the warrantless arrests, thereby justifying the continued incarceration of the arrestees.[2]

If the constitutional requirement that, within 48 hours following a warrantless arrest, an impartial judge must make a "fair and reliable determination of probable cause," is to have any meaning at all, the information submitted to the judge in support of the warrant request is most certainly relevant. Unless the judge is presented with accurate information about the specific evidence that existed at the moment of the arrest, it is impossible to make a "fair and reliable determination of probable cause."

In cases involving search warrants, and in cases involving arrest warrants sought *prior* to an arrest, the law is clear that an officer may be held liable under 42 U.S.C. § 1983 for an illegal search or seizure when the officer "knowingly and deliberately, or with a reckless disregard for the truth" makes "false statements or omissions that create a falsehood" and "such statements or omissions are material, or necessary, to the finding of probable cause." *Wilson v. Russo,* 212 F.3d 781, 786-87 (3d Cir. 2000) (cited with approval by the Sixth Circuit in *Vakilian v. Shaw,* 335 F.3d 509, 517 (6th Cir. 2003)).[3] *See also Hill v. McIntyre,* 884 F.2d 271, 275 (6th Cir. 1989). As this court said in *Hinchman v. Moore*, 312 F.3d 198, 205-06 (6th Cir. 2002), "[f]alsifying facts to establish probable cause to arrest and prosecute an innocent person is of course patently unconstitutional." When an affidavit contains false statements or material omissions, the question becomes whether, once the false statements are omitted and the omitted facts are inserted, the "corrected affidavit" is still sufficient to establish probable cause. *Wilson,* 212 F.3d at 789. *See also Hill,* 884 F.2d at 275 (a Fourth Amendment violation exists if, "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause" (quoting *Franks v. Delaware,* 438 U.S. 154, 155-56 (1978))).

I believe that this same analysis must be applied when an arrest warrant is sought following a warrantless arrest. The probable cause determination by an impartial judge is more than a "rubber stamp" after the fact of an arrest. The judge is required to make an independent determination of whether probable cause existed at the moment of the arrest. If it is a constitutional violation to submit false statements and omit material facts when seeking a warrant *prior* to an arrest, it is also,

---

[2] The majority contends that Spencer and Peet failed to raise this argument in their complaints. *See* Maj. Op. Section II(B) n.2. Although stated in the context of any claim of qualified immunity by defendants, plaintiffs did allege the unlawful conduct of defendants by reasons of "their non-testimonial acts of misstating their Investigator's Report to influence the appearance of Plaintiff's guilt so that a warrant could issue and in providing false evidence to a magistrate so that probable cause could be established." First Am. Compl. ¶ 50, J.A. at 26.

[3] "An assertion is made with reckless disregard when 'viewing all the evidence, the affiant . . . entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'" *Wilson*, 212 F.3d at 788 (quoting *United States v. Clapp*, 46 F.3d 795, 801 n.6 (8th Cir. 1995)). Omissions are made with reckless disregard if an officer withholds "a fact in his ken" that "any reasonable person would have known . . . is the kind of thing the judge would wish to know." *Wilson*, 212 F.3d at 788 (quoting *United States v. Jacobs,* 986 F.2d 1231, 1235 (8th Cir. 1993)).

in my opinion, a constitutional violation to submit false statements and omit material facts when seeking a judicial determination of probable cause following a warrantless arrest. The constitutional requirement of a "fair and reliable determination of probable cause" applies with equal force in both cases. With this premise in mind, I turn then to an application of the law to the facts of this case.

### B. The False and Misleading Statements and Material Omissions in the Request for an Arrest Warrant

Based on the information Pearson submitted with his request for an arrest warrant, the judge determined that probable cause existed for the warrantless arrests of Spencer and Peet, and therefore they continued to be held in jail. That probable cause determination, however, was based on a report that was constitutionally deficient in numerous respects. It contained false and misleading statements and omitted a great deal of exculpatory information.

The most glaring error was Pearson's patently false statement that eyewitnesses Bracey and Anderson would testify that Spencer and Peet (identified in the report as "Defendants #1 and #2"), had robbed them at the gas station next to the Coney Island restaurant. J.A. at 381. In fact, absolutely nothing in their statements implicates Spencer or Peet. That same report states that Feanda Wilson saw "Defendants #1 and #2," *i.e.,* Spencer and Peet, attempt to rob Reed Byrd of his coat, and heard "Defendant #1," *i.e.,* Spencer, tell the unidentified gunman to shoot Byrd. J.A. at 380-81. The judge who made the probable cause determination obviously would have relied on the fact that, according to Pearson's report, three separate eyewitnesses -- Wilson, Bracey and Anderson -- all had identified Spencer and Peet as participants in the crime prior to their arrests, an extremely inculpatory fact that was, however, undeniably false.

Pearson's report also states that Wilson, the key witness, would testify that she positively identified Spencer and Peet in a show up/line up at the police station. J.A. at 381. While not technically a false statement, it is patently misleading. It would lead any judge to believe that Wilson's eyewitness identification of Spencer and Peet in the lineup at the police station occurred *before* the arrests. In fact, the identification did not occur until *after* the arrests. Because the probable cause determination must be based on what evidence existed at the moment of the arrest, the evidence submitted to the judge should have been confined to the evidence Pearson had available when Spencer and Peet were taken into custody. Evidence of Wilson's later eyewitness identification should not have been submitted to the judge for consideration in determining whether probable cause existed at the time of the arrests.

Not only did the report contain false and grossly misleading statements, it also omitted important exculpatory information. For example, it fails to note discrepancies between the physical descriptions of the robbers given by witness John Anderson and by Feanda Wilson. Wilson described the gunman as a black male, 20-23, 5'7," 165-170, light complexion, braided hair, light grey jogging suit, white shirt. She described the man who gave her his pager number, *i.e.,* Spencer, as a black male, 20-25, 5'4"-5'5," 170, dark complexion, mustache, braids, wearing a black leather jacket and dark pants. The other accomplice, *i.e.,* Peet, was described as a black male, 20-25, 5'8," 180, light complexion, low cut hair, gray hooded sweatshirt, light colored pants. J.A. at 236. Anderson's description of the gunman matched Wilson's statement.[4] However, Anderson stated that one of the other accomplices was wearing a red pullover jacket and a red skull cap. J.A. at 451-52. This description is, of course, completely inconsistent with Wilson's descriptions of Spencer and Peet.

---

[4] Notably, the physical descriptions of the perpetrators given by these witnesses would comfortably fit a large number of African-American men.

Pearson's report also fails to note that although the initial police report indicates that there were only two perpetrators, Wilson later stated that there were three. J.A. at 235-37, 394. In addition, the report fails to mention that although Wilson initially told the responding officer that the suspects were driving a light blue Ford F-150 pickup truck, J.A. at 394, and later said it was a dark blue Ford F-150, J.A. at 236, Peet's vehicle was actually a midnight blue Dodge Ram.

It is undisputed that, at some point during the investigation, Pearson came to doubt the veracity of Wilson's statement. On May 2nd, just four days after he submitted his report, he wrote in his Progress Notes that he planned to arrange for Wilson to take a polygraph test because her statement was out of line with the statements of all other witnesses. Pearson admitted at his deposition that he might have had doubts about the truthfulness of Feanda Wilson's statement even *before* the warrant was issued:

Q.   Okay. But between the time you took Wilson's statement and the time you took Bracey's statement, you had a question about Feanda Wilson's truthfulness, correct?

A.   I don't know when I had a disbelief at the time. It might have been after the warrant was signed.

Q.   It might have been before the warrant was signed, correct?

A.   Could have been.

Q.   And if it had been before the warrant was signed --

A.   Then a warrant probably wouldn't have been signed.

Q.   Would you have been duty-bound to put that in your request for warrant?

A.   You don't put that in your warrant request.

Q.   You don't?

A.   No.

Q.   Why not?

A.   It's information about the circumstances. It don't say if you have witnesses in doubt.

Q.   You don't put in there that I don't think she's being truthful?

A.   No, you don't.

Q.   You don't put in there the parts that you think she's being untruthful about?

A.    The reason why I don't put it in there is because all I do is gather information and give it to the prosecutor.   Even though the statement is saying one thing, she the one made the statement.  If any of us have any doubtfulness, then we'll let the prosecutor know maybe on a piece of paper that witness may be questionable, but it never goes into the investigative report.

J.A. at 364-365.  So even if Pearson had doubts about the truthfulness of his key witness, he would have concealed those doubts from his investigative report and his request for a warrant made to the judge who was to make the probable cause determination.  In my view, Pearson's failure to disclose his doubts about the veracity of Wilson's statement in his report and request must be considered a material omission.

I believe that Pearson had good reason to doubt the veracity of Wilson's statement even before he submitted the request for an arrest warrant.  Wilson's written statement was inconsistent with the statement she gave to the police who responded to her call at the scene of the crime, and it was not corroborated by the statement of any other witness.  Common sense also calls her statements into serious doubt.  As this court pointed out in *Gardenhire v. Schubert,* 205 F.3d 303 (6th Cir. 2000), the unlikely conduct of a defendant is a factor to consider in the determination of whether a police officer had probable cause for a warrantless arrest.  *Id.* at 315 ("It is unlikely that one store owner would steal goods from another and then leave those goods in the window of her own store-front.").  In this case, it is extremely unlikely that Spencer would give Wilson his pager number so that she could locate him, and then proceed to commit a violent crime in her presence.  As *Gardenhire* also points out, officers must consider the "totality of the circumstances, recognizing both the inculpatory *and* exculpatory evidence" in determining whether they have probable cause to make an arrest.  *Id.* at 318 (emphasis in original).

The question then becomes whether, once the false and misleading inculpatory statements are omitted from Pearson's report, and the material exculpatory evidence is included, probable cause nevertheless exists to believe that Spencer or Peet had committed a crime.[5]

---

[5] In footnote 2 of the majority opinion, the majority contends that there are two "temporal" problems with the dissent's position.  First, the majority claims that there is no evidence that Pearson had any doubt about the culpability of the plaintiffs prior to his submission of the warrant request.  To the contrary, as noted above, Pearson admitted at his deposition that he might have had doubts about Wilson's truthfulness even *before* the warrant was signed.  J.A. at 364-65.  Second, the majority contends that "the dissent faults the investigators for mentioning Wilson's eyewitness identification in their warrant request."  This is not correct.  The dissent faults Pearson for including this information without disclosing to the judge that Wilson's identification took place *after* Spencer and Peet had already been arrested.  Absent this disclosure, the judge was misled to believe that Wilson's eyewitness identification took place before Spencer and Peet were taken into custody and thus considered identification evidence that did not exist at the moment of plaintiffs' arrests.

The dissent does not fault Pearson for failing "to include post-*warrant* exculpatory evidence."  Indeed, if evidence becomes known for the first time after the warrant request has been submitted, it obviously could not have been included in that request.  The dissent admits that it does fault Pearson "for including post-*arrest* incriminatory evidence," because such evidence is also irrelevant to a determination of whether probable cause existed at the moment of the arrests.  The majority further argues that this post-arrest evidence "did not clearly exonerate Spencer and Peet."  Apart from the fact that it is not our responsibility to judge the guilt or the innocence of Spencer and Peet – whether certain evidence does or does not exonerate them – the point is that inculpatory events post-arrest and prior to warrant, such as Wilson's line-up identification, should not be used for the purpose of obtaining a finding of probable cause for their arrests.

Finally, I do not feel that it is true, as the majority contends, that "the dissent demands a level of perfection that would be difficult for most police departments to meet."  I do not believe that it is unreasonable to expect law enforcement officers seeking a probable cause determination from a judge following a warrantless arrest to refrain from

### C.        Pearson's Liability for Unlawful Arrests

### 1.        Probable Cause for Spencer's Arrest is a Jury Issue

With respect to Spencer, the majority concludes, as did the district court, that probable cause existed to believe that Spencer had robbed Reed Byrd outside the Coney Island restaurant. That conclusion is based primarily on Wilson's written witness statement, taken approximately six hours after the shootings. According to Wilson, the gunman's two accomplices came into the Coney Island restaurant to order food. One of them gave her his pager number, either "232-0235 or 6235 and the name 'Mail.'" J.A. at 236. The two then went to the parking lot and ate in their truck, a "dark blue Ford F-150 pickup, late 80's, early 90's." J.A. at 236. Wilson said that she later observed these two men trying to rob Reed Byrd of his coat and heard the one who had given her his pager number tell the gunman to shoot Byrd. J.A. at 235-36.

Pearson traced that pager number to Spencer and arrested him without a warrant shortly thereafter. If Wilson's statement, standing alone, were reliable enough to support probable cause for Spencer's arrest, then Pearson should have immediately sought an arrest warrant. Pearson, however, obviously felt the need to obtain additional evidence to justify the warrantless arrest. In *County of Riverside,* the Supreme Court held that "delays for the purpose of gathering additional evidence to justify the arrest" were just one example of unreasonable delays in seeking an arrest warrant. 500 U.S. at 56. Pearson's Progress Notes indicate that three hours after Spencer's arrest, and prior to writing his request for an arrest warrant, Pearson arranged to have Wilson identify Spencer in a lineup. Before writing the request for an arrest warrant, Pearson also went to the scene of the crime to see if any video cameras were running when the crime occurred and took the gas station cashier, Salah Alhalmi, to the police station for questioning.[6]

I believe that genuine issues of material fact preclude summary judgment on the question of whether, at the time of Spencer's arrest, probable cause existed to believe that he had committed a crime. There is no question that after Spencer returned a call placed to one of the pager numbers given by Wilson, Spencer was arrested based only on this evidence. However, even though Wilson said that the man who gave her the pager number said his name was "Mail," J.A. at 236, there is no evidence that Spencer ever used that name. Pearson obviously believed that the evidence against Spencer was not enough to justify probable cause for the arrest, because he did not prepare his report and request for a warrant until after Wilson had identified Spencer in a police lineup. As noted earlier, however, Wilson's eyewitness identification of Spencer at the lineup must be excluded from consideration because it occurred after his arrest.

Construing the evidence in the light most favorable to the plaintiff, I believe that a reasonable jury could find that Spencer was arrested without probable cause. This is particularly true once Pearson's admittedly false but extremely inculpating statements concerning eyewitnesses Bracey and Anderson are excluded from consideration, and all material exculpatory evidence, including Wilson's contradictory statements and Pearson's doubts about her credibility, are taken into consideration. As this court has said on more than one occasion, "the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Wilson v. Morgan*, 477 F.3d 326, 334 (6th Cir. 2007) (quoting *Gardenhire*, 205 F.3d at 315). *See also Gregory v. City of Louisville*, 444 F.3d 725, 743 (6th Cir. 2006) ("In a § 1983 action, the existence of probable cause is a question of fact. *See United States v. Gaudin*, 515 U.S. 506, 521,

submitting false and misleading statements and omitting exculpatory evidence known to the officer. I am confident that improper conduct of this nature rarely happens. However, when it does, as in this case, there should be a remedy for an arrestee whose Fourth Amendment right to a fair and reliable determination of probable cause has been violated.

[6] Alhalmi's statement is not part of the record.

115 S.Ct. 2310, 132 L.Ed.2d 444 (1995).").  I would therefore reverse the summary judgment rendered in favor of Pearson and have the issue of probable cause for Spencer's arrest submitted to a jury.  I turn next to Peet's claim of arrest without probable cause.

### 2.      Peet is Entitled to Summary Judgment on His Claim of Arrest Without Probable Cause

### a.      Lack of Probable Cause

The district court held that Peet's admission that he was present at the Coney Island restaurant on the night in question was sufficient, when coupled with Wilson's statements, to establish probable cause for Peet's arrest.  As discussed in the next section, the majority affirms the district court's order granting summary judgment in favor of Pearson, albeit for a different reason.

The majority opinion states that, "Investigator Pearson identified the plaintiffs, Dennis Peet and Jeemell Spencer, as suspected accomplices by relying, primarily, on Spencer's pager number, which an eye witness, Feanda Wilson, provided."  Maj. Op. Section I.  This is not entirely correct.  Pearson identified Spencer as a suspect based on Spencer's pager number, but Pearson had no evidence that would have justified Peet's arrest.  In fact, at his deposition, Pearson testified that he did not know what probable cause existed for Peet's arrest, other than, "[h]e could have been put in the system as wanted in regards to questioning to a homicide if that goes into the system." J.A. at 363.  Peet testified that he was arrested as soon as he acknowledged that he had witnessed the robbery at the Coney Island restaurant.  J.A. at 314.  Peet's admission that he was present at the Coney Island restaurant on the night in question is, of course, insufficient to establish probable cause for his arrest.  *United States v. Castro-Gaxiola*, 479 F.3d 579, 583 (8th Cir. 2007).

In my opinion, no reasonable jury could find that probable cause existed for Peet's arrest.  None of the witness statements, including Wilson's, incriminates Peet.  Wilson did not identify Peet by name and, as noted earlier, her identification of Peet during the lineup occurred *after* his arrest and is therefore irrelevant to the probable cause determination.  While the record shows that Peet was arrested within a few hours of Spencer's arrest, absolutely nothing in the record indicates how the police came to suspect that it was Peet who was with Spencer on the night in question.  Moreover, as noted earlier, although Wilson stated that the perpetrators left the scene in a Ford F-150 pick-up truck, Peet was arrested while possessing a Dodge Ram pick-up truck.  For these reasons, as well as those discussed earlier, I believe that, at the time of Peet's arrest, the police clearly lacked probable cause to believe that he had committed a crime, and that no reasonable jury could find otherwise.  I would therefore reverse the district court's order granting Pearson's motion for summary judgment and remand with instructions to enter summary judgment in favor of Peet on Peet's cross-motion for summary judgment.

### b.      Pearson's Liability for Peet's Wrongful Arrest

The district court acknowledged that there was a genuine issue of material fact concerning "Pearson's alleged omissions and mischaracterizations regarding Bracey's and Anderson's statements," but found that Peet's admission that he was present during the robbery, coupled with Wilson's statements, established probable cause for his arrest.  J.A. at 46-49.  On appeal, Peet challenges this holding.  The majority, however, avoids the probable cause issue, affirming the district court for an entirely different reason.

The majority opinion affirms the summary judgment against Peet for the reason that, "the record does not reflect that Pearson participated in the arrest of Peet.  His deposition says that he did not, his progress notes do not mention it, and we are directed to no contrary testimony."  Maj. Op.

Section III.  The majority raises this issue for the first time in this case.[7]  The record, in my opinion, does not support the majority's argument that Pearson did not participate in Peet's arrest.

First, it is undisputed that Pearson, an investigator with the Homicide Squad, received this case at 8:00 A.M. following the murder of Byrd, and that he was the sole person in charge of the investigation that culminated in his investigation report and request for an arrest warrant.  He prepared detailed notes of the progress of his investigation,  J.A. at 372-377, and according to the Appellees' own brief, Pearson prepared the warrant request and submitted it to the Wayne County Prosecutor's Office which, in turn, submitted it to a judge for the issuance of the arrest warrant. Appellee's Brief at 9-10.

Second, while there is no evidence that Pearson himself was physically present when Officer Amos arrested Peet, it is inconceivable that Amos would take it upon himself to arrest Peet without being instructed to do so by Pearson, who was in charge of the investigation, or without Pearson's knowledge and approval.  Moreover, Peet was promptly taken by Officer Amos to the police station where Pearson himself was waiting to conduct a lineup that included Peet.  J.A. at 156-158.

Third, Pearson never testified that he did not participate in Peet's arrest.  Pearson simply testified that he "wasn't with him when he was arrested" and "I didn't lock him up."  J.A. at 363. The person in charge of a murder investigation is not expected to be physically present at every arrest made during the course of the investigation, but Pearson's absence does not necessarily relieve him from liability for a wrongful arrest that, even if not directed by him, was obviously approved by him.

Fourth, the fact that Pearson's Progress Notes do not mention that Pearson directed Peet's arrest and failed to show Pearson being present at Peet's arrest does not, of course, mean that Pearson had nothing to do with Peet's arrest.  The overwhelming and uncontradicted evidence shows that it was Pearson who was in the commander's seat, the man in charge of the investigation, the person who was waiting for Amos to bring Peet to the police station so that Feanda Wilson could identify Peet in a lineup.

Fifth, there is no "contrary testimony" to Pearson's testimony that he was not present when Amos arrested Peet, because that fact is not disputed.  It is also not disputed that Pearson supervised the investigation, noted Peet's arrest in his Progress Notes, and arranged for the lineup promptly after Peet's arrest.

Pearson concededly cannot be held liable for Peet's arrest by Amos on a *respondeat superior* basis, but he can be held liable, as the person in charge of the investigation that included Peet's arrest, if he "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."  *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982).

There was absolutely no evidence of probable cause for the arrest of Peet.  He was arrested solely on his statement that he had been at the scene of the crime; yet, he was immediately handcuffed and taken to the jail where Pearson was waiting for him so he could be placed in a lineup with the hope that Feanda Wilson would identify him.  Pearson had no knowledge of any facts that would justify Peet's arrest, but he nevertheless, at the very least, "implicitly authorized, approved, or knowingly acquiesced" in the warrantless arrest.

---

[7] In their Motion for Summary Judgment, the Appellees themselves agreed that a claim was stated against Pearson.  "With the exception of Defendant Pearson, Plaintiff fails to state a claim against the other defendant police officers."  J.A. at 108.

### D.          Qualified Immunity

Neither the district court nor the majority reaches the issue of qualified immunity because they find that Pearson is entitled to summary judgment on the merits of plaintiffs' claims of unlawful arrest. Since I reach the contrary conclusion, a brief discussion of qualified immunity is warranted. "Qualified immunity is an affirmative defense that shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Estate of Carter v. Detroit*, 408 F.3d 305, 310 (6th Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). As the Supreme Court explained in *Saucier v. Katz*, 533 U.S. 194 (2001), qualified immunity involves a two-step inquiry. First, the court must determine whether the facts, viewed in the light most favorable to the plaintiff, show that a constitutional violation has occurred. Second, the court must determine whether the constitutional right was clearly established. *Id.* at 201.

I would find that Pearson is not entitled to qualified immunity on plaintiffs' claims of arrest without probable cause. For all of the reasons previously discussed, I would find that, viewed in the light most favorable to the plaintiffs, there is abundant evidence that a Fourth Amendment violation occurred. Pearson, in his report submitted in connection with the warrant request, knowingly and deliberately, or with a reckless disregard for the truth, made false statements and omissions that were material to a determination of probable cause. As this court held in *Hinchman*, this is "of course patently unconstitutional." 312 F.3d at 205-06. Once those false and misleading statements are omitted and the omitted exculpatory evidence is included, it is my opinion that no reasonably competent police officer would have believed that probable cause existed to believe that Spencer and Peet had committed a crime. Moreover, as this court recently noted in *Leonard v. Robinson,* 477 F.3d 347 (6th Cir. 2007), "[i]t is clearly established that arrest without probable cause violates the Fourth Amendment." *Id.* at 355 (quoting *Donovan v. Thames*, 105 F.3d 291, 297-98 (6th Cir. 1997)). Therefore, in my view, Pearson is not entitled to qualified immunity on plaintiffs' § 1983 claims for unlawful arrest.

### E.          Municipal Liability for Peet's Arrest

Peet's First Amended Complaint alleged that the City of Detroit should be held liable for his unlawful arrest because, in part, the City had "a custom or policy of arresting witnesses to get them to cooperate." J.A. at 29. Peet claims that he was arrested solely because he was a witness to a crime. According to Peet's testimony, after he was approached by the police and identified himself as Dennis Peet, they asked him if he had witnessed a crime that was committed at the Coney Island restaurant. When Peet replied, "Yes, I seen some guy get robbed up there," he was immediately handcuffed and taken to jail. J.A. at 314.

The district court granted summary judgment in favor of the City of Detroit, holding that plaintiffs could not complain about the alleged unconstitutional arrests and treatment of other persons who were also questioned in connection with Byrd's murder. With respect to plaintiff Peet, the court found that "the Detroit Police Department had a probable cause to arrest Peet as a suspect following Miss Wilson's statement . . . and as such the claims about the Detroit Police Department's policies and practices regarding the arrests of witnesses in murder cases are not implicated here." J.A. at 461-462.

The majority affirms the district court's decision granting summary judgment in favor of the City, "because Peet has not produced sufficient evidence tending to prove that Detroit tolerated a custom of federal rights violations that could have caused Peet to be arrested without probable cause." Maj. Op. Section III. The majority notes that there is evidence that, like Peet, two other persons were arrested as witnesses to the crime and threatened with continued detention or criminal charges if they did not implicate Spencer and Peet in the murder. The majority finds that these three

incidents, all related to this case, are insufficient to establish a policy or custom on the part of the City.

The majority does not consider other evidence that, at the time of Peet's arrest, the City of Detroit had an established practice of arresting witnesses to major crimes. Plaintiffs submitted the deposition testimony of Sergeant Felix Kirk of the Detroit Police Department, who testified in the case of *Taylor v. City of Detroit*, Case No. 03-72258, filed in the Eastern District of Michigan. Kirk testified that the Department was recently forced to change its policy involving "illegal detention of witnesses and the arrest of witnesses." J.A. at 440. In that case, the court denied the City's motion for summary judgment, finding sufficient evidence that the police department had a "custom or policy of unconstitutional conduct." *See Taylor v. City of Detroit,* 368 F. Supp. 2d 676, 692 (E.D. Mich. 2005).

Construing all of this evidence in the light most favorable to the plaintiff, a reasonable jury could find that the City's policy or practice of arresting witnesses to crimes was the moving force behind Peet's unlawful arrest. I would therefore reverse the district court's order granting summary judgment in favor of the City on Peet's claim of unlawful arrest.

## II. Malicious Prosecution Claims

### A. The Elements of a Tort Claim of Malicious Prosecution

#### 1. Common Law Tort

The elements of the common law claims of false arrest and malicious prosecution are clearly different. A state law claim of false arrest is based simply on an absence of probable cause for the arrest. A state law claim of malicious prosecution, in this case under Michigan law, requires proof:

> (1) that the defendant has initiated a criminal prosecution against him, (2) that the criminal proceedings terminated in his favor, (3) that the private person who instituted or maintained the prosecution lacked probable cause for his actions, and (4) that the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice.

*Peterson Novelties, Inc. v. City of Berkley*, 672 N.W.2d 351 (Mich. Ct. App. 2003) (quoting *Matthews v. Blue Cross & Blue Shield of Mich.*, 572 N.W.2d 603 (Mich. 1998)).

#### 2. Constitutional Tort

In *Spurlock v. Satterfield*, 167 F.3d 995, 1005 (6th Cir. 1999), this court held that fabricating evidence and manufacturing probable cause to unlawfully detain a suspect constituted a Fourth Amendment violation. With the exception of one panel's decision in *Frantz v. Village of Bradford*, 245 F.3d 869 (6th Cir. 2001), the law in this circuit is uniform and well established that a malicious prosecution claim can be based on the Fourth Amendment, and that prosecution without probable cause constitutes a violation of that Amendment. In *Barnes v. Wright*, 449 F.3d 709 (6th Cir. 2006), the court stated:

> We "recognize a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment." *Thacker v. City of Columbus*, 328 F.3d 244, 259 (6th Cir. 2003). Such a claim encompasses wrongful investigation, prosecution, conviction, and incarceration. *Id*. at 258 (citing *Spurlock*, 167 F.3d at 1005-07).

*Id*. at 715-16.  *See also Gregory v. City of Louisville*, 444 F.3d 725, 749 (6th Cir. 2006) ("continued detention without probable cause is an actionable Fourth Amendment injury under § 1983");[8] *Bielefeld v. Haines*, 192 F. App'x 516, 520 (6th Cir. 2006) ("this circuit has recognized a Section 1983 claim for malicious prosecution based on the Fourth Amendment"); *Doyle v. McFadden*, 182 F. App'x 506, 509 (6th Cir. 2006).

While it is clear that a malicious prosecution claim is cognizable under § 1983 as a Fourth Amendment violation, our circuit has not yet defined all of the elements of this constitutional tort. In *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007), the court stated:

> This court has recognized a § 1983 claim for malicious prosecution arising under the Fourth Amendment, but the contours of such a claim remain uncertain. *Wallace*, 127 S.Ct. 1096, n.2; *McKinley v. City of Mansfield*, 404 F.3d 418, 444-45 (6th Cir. 2005), *cert. denied*, 126 S.Ct. 1026 (2006); *Darrah v. City of Oak Park*, 255 F.3d 301, 308-12 (6th Cir. 2001).  What is certain, however, is that such a claim fails when there was probable cause to prosecute, or when the defendant did not make, influence, or participate in the decision to prosecute. *McKinley*, 404 F.3d at 444-45; *Darrah*, 255 F.3d at 312; *Skousen v. Brighton High Sch.*, 305 F.3d 520, 529 (6th Cir. 2002).

*See also Thacker*, 328 F.3d at 259 ("[a]lthough this Court has yet to resolve the elements of a federal malicious prosecution claim, it is clear that a plaintiff must show, at a minimum, 'that there was no probable cause to justify [his] arrest and prosecution.'").

In previous decisions of this court, it usually was not necessary to formulate the elements of a federal malicious prosecution claim, because either the plaintiff had failed to show that the prosecution was without probable cause or the plaintiff was estopped from asserting such a claim by reason of a judicial finding of probable cause following a fair evidentiary hearing.  In view of the fact that, for the reasons hereafter stated, I believe that a jury question is presented on the issue of probable cause for the plaintiffs' prosecution and that plaintiffs are not collaterally estopped from asserting their claims, it appears that this is a case in which the elements of plaintiffs' wrongful prosecution claims necessarily need to be considered.

### 3.      Suggested Elements

The dissenting opinion in *Frantz* proposed the following elements for a constitutional tort claim of malicious prosecution:  (1) a seizure within the meaning of the Fourth Amendment by someone not entitled to absolute prosecutorial immunity; (2) objectively unreasonable prosecutorial action taken to bring the plaintiff before the court, independent of any initial physical seizure; and (3) termination of the criminal proceeding in favor of the plaintiff.  *Frantz*, 245 F.3d at 879-80 (Gilman, J., dissenting).

In light of the more recent Sixth Circuit jurisprudence concerning this issue, I would suggest the following elements:

1.      The defendant is a person who does not have absolute prosecutorial immunity for his or her conduct in the criminal prosecution of the plaintiff;

---

[8] To emphasize that this constitutional tort is based on the Fourth Amendment and not on any due process grounds, the court said, "[s]eeking clarity in language, we decline to style Plaintiff's cause of action as an action for 'malicious prosecution' under § 1983. Rather, we characterize the cause of action simply as the right under the Fourth Amendment to be free from continued detention without probable cause." *Gregory*, 444 F.3d at 750.

2.    There was no probable cause for the initiation and maintenance of the criminal prosecution of the plaintiff;

3.    The defendant intentionally influenced or participated in the initiation or the maintenance of the criminal prosecution of the plaintiff;

4.    A person in defendant's position would have known that the facts and circumstances were not sufficient to justify a reasonable belief that the plaintiff had committed the offense with which the plaintiff was charged; and

5.    The criminal prosecution of the plaintiff was subsequently terminated in favor of the plaintiff.

## B.    Application of the Suggested Elements to the Facts of this Case

There is no question that Pearson has no absolute prosecutorial immunity for his conduct in the criminal prosecution of the plaintiffs, that he intentionally influenced and participated in the initiation and maintenance of the criminal prosecution of the plaintiffs, and that the criminal prosecution was subsequently terminated in favor of the plaintiffs. The only questions are whether there was probable cause for the initiation and maintenance of the criminal prosecution of the plaintiffs, and whether a person in Pearson's position would have known that the facts and circumstances were not sufficient to justify a reasonable belief that the plaintiffs had committed the offenses with which they were charged. In my opinion, these questions in this particular case must be determined by a jury.

The district court found, and I totally agree, that "[t]here may be enough evidence to create a genuine issue of material fact regarding Pearson's alleged omissions and mischaracterizations regarding Bracey's and Anderson's statements." J.A. at 46. The court nevertheless found, with reference to both questions of probable cause for plaintiffs' arrests and probable cause to bind plaintiffs over for trial, that "Wilson's eyewitness report" alone established probable cause. J.A. at 49. For the reasons discussed earlier, I believe that Wilson's statements made prior to plaintiffs' arrests, when considered with all of the facts and circumstances known to Pearson at the time of the arrests, were not sufficient, on Pearson's motion for summary judgment, to establish probable cause for the arrests.

In determining whether probable cause existed for the initiation of criminal proceedings against plaintiffs, however, the court may consider not only the evidence that existed at the time of the arrests but also other evidence gathered before criminal charges were actually filed. Therefore, although Wilson's eyewitness identification of plaintiffs at the police lineups could not be considered in determining whether probable cause existed at the time plaintiffs were arrested, it may be considered in determining whether probable cause existed to file criminal charges against them, because the lineups took place before Pearson prepared his report and charges were filed. Indeed, the issue of probable cause for the prosecution of plaintiffs essentially hinges on Wilson's personal identification of them because, as Pearson himself noted in his Progress Notes, her statement was out of line with the statements of all other witnesses.

Wilson's eyewitness identification at the police lineups, however, does not conclusively establish probable cause. This court has held:

> An eyewitness identification will constitute sufficient probable cause "unless . . . there is an apparent reason for the officer to believe that the eyewitness 'was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation.'" This comports with the general notion that, since

> eyewitnesses' statements are based on firsthand observations, they
> are generally entitled to a presumption of reliability and veracity.

*Ahlers v. Schebil*, 188 F.3d 365 (6th Cir. 1999) (internal citations omitted).

Similarly, in *Wilson v. Russo*, the court said:

> The defendants maintain that a positive identification by a victim is
> sufficient by itself to establish probable cause that the identified party
> was the offender. While we agree that a positive identification by a
> victim witness, without more, would usually be sufficient to establish
> probable cause, this qualified precept cannot be rendered absolute.
> *Independent exculpatory evidence or substantial evidence of the
> witness's own unreliability that is known by the arresting officers
> could outweigh the identification such that probable cause would not
> exist. Each case must therefore be examined on its facts.*

212 F.3d at 790 (emphasis added).

For all of the reasons discussed earlier, I believe that Pearson had good reason to believe that Wilson, his key witness, was not a credible witness. It is undisputed that, no later than May 2, 2000, long before the preliminary hearing on May 24, 2000, he came to question her credibility. His Progress Notes on May 2, 2000 indicate that her statement was out of line with those of the other witnesses and he planned for Wilson to take a polygraph test. It is not clear from the record, however, whether he ever communicated this doubt to the prosecutor or to the preliminary hearing judge who bound plaintiffs over for trial or, if he did, when this was done. Pearson himself testified that he did not put that extremely exculpatory fact in his investigative report: "If any of us have any doubtfulness, then we'll let the prosecutor know maybe on a piece of paper that witness may be questionable, but it never goes into the investigative report." J.A. at 365. There is absolutely no evidence that Pearson ever noted his doubtfulness "on a piece of paper" given to the prosecutor.[9]

In my view, if Pearson concealed from the prosecutor his doubts about the credibility of his key witness, or did not make such a disclosure at a time and in a manner for this exculpatory information to be properly given to defense counsel and considered by the magistrate judge at the preliminary hearing, Wilson's eyewitness identification of the plaintiffs at the police lineups should be given little or no consideration in determining whether there was, in fact, probable cause for the initiation and maintenance of the criminal prosecution against plaintiffs.

Moreover, as noted in *Wilson v. Russo*, the substantial evidence of Wilson's unreliability and the other independent exculpatory evidence known to Pearson could well outweigh the value of Wilson's eyewitness identification such that probable cause would not exist. 212 F.3d at 790. At the very least, this is a question for a jury and not for the judge on defendants' motion for summary judgment.

With regard to the remaining suggested element, it is clearly, in my view, also a jury question as to whether a police officer in Pearson's position would have known that the facts and circumstances were not sufficient to justify a reasonable belief that the plaintiffs had committed the offenses with which they were charged.

---

[9] At some point, Pearson apparently turned his Progress Notes over to the prosecutor, but it is not clear when he did so. J.A. at 44, J.A. at 472.

While, in my opinion, construing the evidence in the light most favorable to the plaintiffs, it was error for the district court to find that Wilson's "eyewitness report" alone was sufficient to establish probable cause for the arrest and prosecution of plaintiffs, there remains the issue of whether plaintiffs are estopped from asserting their claims for malicious prosecution because of the preliminary hearing finding of probable cause.

### C.    Preliminary Hearing Finding of Probable Cause to Hold Defendants for Trial as Collateral Estoppel on the Issue of Probable Cause for the Prosecution

The majority finds that the district court "properly granted summary judgment to the officers as to Spencer's claim for malicious prosecution," because "Spencer has the problem of the judicial determination of probable cause following the evidentiary preliminary hearing." Maj. Op. Section II(C).[10] The majority finds that because there is no evidence that Pearson or the county prosecutor supplied the magistrate judge at that hearing with any false information to establish probable cause, plaintiffs are collaterally estopped from relitigating the issue.

For the following reasons, I do not believe that the preliminary hearing in this case judicially precludes plaintiffs from pursuing their claims that the initiation and maintenance of the criminal proceedings following their arrests were without probable cause.

First, under Michigan law of collateral estoppel, one of the four critical requirements is that "the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding." *Darrah*, 255 F.3d at 311. Based on the limited evidence in the record, I believe that it has not been shown that plaintiffs had a full and fair opportunity to litigate the issue of probable cause at the evidentiary preliminary hearing held on May 24, 2000.

As noted earlier, it is not clear whether Pearson ever conveyed his doubts concerning the credibility of his key witness, Feanda Wilson, to the prosecutor or to anyone else prior to that hearing. According to plaintiffs, after Pearson came to question Wilson's credibility, he did not go to the prosecutor. "He does nothing about that he doesn't come forth, he doesn't go to the prosecutor, he doesn't tell anybody about it." J.A. at 467. It is also alleged, and not denied, that this exculpatory information was not presented at the preliminary hearing. Appellants' Brief p. 29.

It is also difficult to tell, based on the limited record before us, what exculpatory evidence, if any, was made available and was presented at the preliminary hearing.[11] Along with the request for an arrest warrant, Pearson allegedly "turned over all inculpatory and exculpatory statements to the prosecutor and to the defense attorney." J.A. at 462. However, many witness statements were not taken until after the date the warrant request was prepared. J.A. at 471. The record on appeal does not indicate when these additional statements, some of which were clearly exculpatory, were turned over. At the hearing on the motions for summary judgment, counsel for plaintiffs indicated that some of this evidence, which was within Pearson's exclusive control, was not made available until the criminal trial. J.A. at 468. Plaintiffs apparently subpoenaed McGlory and Bracey to testify at the preliminary hearing, but these witnesses failed to appear. J.A. at 276. According to plaintiffs – and it does not appear to be denied by Pearson:

> We didn't even have the opportunity to put on McGlory or Bracey at
> the preliminary exam. The judge didn't allow us. They weren't

---

[10] It is a problem shared by Peet and Spencer; both made claims of malicious prosecution and both were bound over for trial following the preliminary hearing.

[11] The record on appeal includes only 11 pages of a 78-page transcript. J.A. at 276-286.

> subpoenaed by the prosecutor. There wasn't a continuance granted. We didn't have the opportunity to present Latham at the preliminary exam. We didn't have an opportunity to present Marion Benton or John Anderson at the preliminary exam. We didn't have the opportunity to present Ken Smith at the preliminary exam.

J.A. at 469. Under these circumstances, I believe that there are genuine issues of material fact as to whether plaintiffs had a "full and fair" preliminary hearing.

Second, we review the district court's grant of summary judgment de novo. *Sperle v. Michigan Dep't of Corr.*, 297 F.3d 483, 490 (6th Cir. 2002). In accordance with the established precedents of this court, in a § 1983 action the existence of probable cause is a question of fact to be determined by a jury, unless there is only one reasonable determination possible. *Gregory*, 444 F.3d at 743; *Gardenhire*, 205 F.3d at 315. Moreover, we must review the evidence in a light most favorable to the plaintiffs and draw all reasonable inferences in their favor. *Voyticky v. Village of Timberlake*, 412 F.3d 669, 675 (6th Cir. 2005). Under the circumstances of this particular case, in my opinion, there is, at the very least, a jury question presented as to both the probable cause for plaintiffs' arrests and probable cause for plaintiffs' prosecutions, both in alleged violation of the Fourth Amendment to the United States Constitution.

### D.     Qualified Immunity

Finally, it is necessary to apply the two-step inquiry discussed above to determine whether Pearson is entitled to qualified immunity on plaintiffs' claims of wrongful prosecution. Viewing the evidence in a light most favorable to plaintiffs, Pearson violated their Fourth Amendment rights by his conduct in influencing and participating in the decision to prosecute them. *See Spurlock*, 167 F.3d at 1005 (fabricating evidence and manufacturing probable cause, and wrongfully investigating and prosecuting the plaintiffs constituted a violation of the Fourth Amendment). Moreover, as the court noted in *Spurlock*, the right to be free from malicious prosecution is clearly established under the Fourth Amendment. *Id.* at 1006 (citing *Smith v. Williams*, No. 94-6306, 1996 WL 99329, at *5 (6th Cir. Mar. 6, 1996)). Because Pearson's conduct was not objectively reasonable in light of clearly established law, he is not entitled to qualified immunity on plaintiffs' claims of wrongful prosecution.

### III.     Conclusions

My conclusions are that :

1.     The summary judgment in favor of Pearson and the City of Detroit on plaintiffs' claims of being arrested without probable cause should be reversed as to both Spencer and Peet.

2.     The case should be remanded to the district court for further proceedings on plaintiffs' claims of being arrested without probable cause because:

   a.     No jury issue is presented as to the arrest of Peet without probable cause. The undisputed facts show that Peet was illegally arrested without a warrant and that he is entitled to summary judgment against Pearson on this claim.

   b.     There is a genuine issue of material fact as to whether Peet's illegal arrest was caused by the City of Detroit's policy of arresting witnesses to crimes.

      c.     A jury issue of whether there was probable cause for Spencer's warrantless arrest is presented by the facts and circumstances of the case in view of the false inculpatory statements and the omitted exculpatory statements made by Pearson in his investigative report submitted to the prosecuting attorney and, in turn, to the judge.

      d.     Pearson is not entitled to qualified immunity on plaintiffs' claims of arrest without probable cause.

3.     The case should be remanded to the district court for further proceedings on plaintiffs' claims of being wrongfully prosecuted because:

      a.     There is a genuine issue of material fact as to whether there was probable cause for the prosecution of plaintiffs; and

      b.     There is a genuine issue of material fact as to whether plaintiffs are estopped from asserting their claims of wrongful prosecution.

      c.     Pearson is not entitled to qualified immunity on plaintiffs' claims of wrongful prosecution.

For the above reasons, I respectfully dissent.